# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. <br><br><br> Plaintiffs, <br><br> v. <br><br><br><br><br><br> Defendants. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **CIVIL ACTION NO.** <br><br> **JURY TRIAL DEMANDED** <br><br> 3:16-CV-1516-J-20MCR |

## RELATOR'S COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT

2016 DEC -8 PM 12:10
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* Robert Kane and Franklin W. West, <br><br> Plaintiffs, <br><br> v. <br><br> SEMLER SCIENTIFIC, INC., C. R. BARD, INC., BARD PERIPHERAL VASCULAR, INC., COLLABORATIVE CARE DIAGNOSTICS, LLC d/b/a BIOMEDIX, UNITEDHEALTH GROUP INC., UNITEDHEALTHCARE INSURANCE COMPANY, and Medicare Advantage Plans John Does 1-50. <br><br> Defendants. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **CIVIL ACTION NO.** <br><br> **JURY TRIAL DEMANDED** |

## RELATOR'S COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT

# TABLE OF CONTENTS

I.  SUMMARY OF THE CASE ............................................................................................... 1

II.  THE PARTIES ................................................................................................................ 2

III.  JURISDICTION AND VENUE ...................................................................................... 4

IV.  THE FALSE CLAIMS ACT ........................................................................................... 5

V.  BACKGROUND ............................................................................................................. 7

    A.  Peripheral Artery Disease & Traditional Diagnostic Tests ....................................... 7

    B.  Photoplethysmography ............................................................................................... 9

    C.  The CPT Coding System ............................................................................................ 9

    D.  Medicare National Coverage Determinations ......................................................... 10

    E.  Medicare Declares PPG to be Non-Reimbursable .................................................. 12

VI.  FACTUAL ALLEGATIONS ........................................................................................ 13

    A.  The Use of PPG Technology to Diagnose PAD is Cheaper and Faster than Using
        Traditional (and Reliable) Diagnostic Methods ...................................................... 13

    B.  Photoplethysmography Is Inaccurate and Unreliable ............................................. 14

    C.  Defendants Develop, Manufacture, Distribute, Promote and Utilize PPG Devices for
        Diagnosis of PAD ................................................................................................... 15

        1.  Allegations Specific to BioMedix .................................................................... 15

            a.  BioMedix Products ................................................................................... 15

            b.  Relators' Investigation of PADnet ........................................................... 19

            c.  The Relators' Expert Evaluation of PADnet and NCD 20.14 .................. 19

            d.  The CPT Coding Expert's Evaluation of PADnet and CPT Codes 93922, 92923,
               and 93924 ................................................................................................ 20

        2.  Allegations Specific to Semler ......................................................................... 20

            a.  Semler's Devices – FloChec and QuantaFlo ........................................... 20

            b.  Relators' Investigation of FloChec and QuantaFlo ................................. 22

            c.  The Relators' Expert Evaluation of FloChec, QuantaFlo and NCD 20.14 ............. 25

            d.  The CPT Coding Expert's Evaluation of FloChec and QuantaFlo and CPT Codes
               93922, 92923, and 93924 ........................................................................ 25

        3.  Allegations Specific to C.R. Bard .................................................................... 26

        4.  Allegations Common to Semler and C.R. Bard ............................................... 27

    D.  The Manufacturer Defendants Deceptive Marketing Campaign was Extremely
        Successful ................................................................................................................ 28

    E.  Medicare Advantage Defendants ............................................................................. 28

        1.  Background on the Medicare Advantage Program ........................................... 28

2.  The Role of the Medicare Advantage Defendants ............................................................ 30

VII. DEFENDANTS KNOWINGLY CAUSED THE SUBMISSION OF FALSE CLAIMS FOR REIMBURSEMENT TO THE GOVERNMENT, WHICH RESULTED IN SUBSTANTIAL HARM TO THE GOVERNMENT. ........................................................ 33

A.  The Manufacturer Defendants Caused the Submission of Claims Barred by NCD 20.14  33

B.  The Manufacturer Defendants Caused the Submission of Claims Using Inapplicable CPT Codes ...................................................................................................................34

C.  The Manufacturer Defendants Caused the Submission of Claims for Medically Unnecessary Services ........................................................................................... 35

D.  Semler and UHG Presented or Caused the Presentment of False Claims in Connection with Medicare Advantage Plans ......................................................................... 36

VIII.  COUNTS ....................................................................................................................... 37

1.      Robert Kane and Franklin W. West ("Relators"), on behalf of the United States of America, bring this action against Semler Scientific, Inc. ("Semler"), C.R. Bard, Inc., Bard Peripheral Vascular, Inc. (together with C.R. Bard, Inc., "Bard"), Collaborative Care Diagnostics, LLC d/b/a BioMedix ("BioMedix,") (collectively the "Manufacturer Defendants"), UnitedHealth Group, Inc. and UnitedHealthcare Insurance Company (together with UnitedHealth Group, Inc. "UHG"), and Medicare Advance Plans John Does 1-50) (collectively with UHG, the "Medicare Advantage Defendants") for violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.,* to recover all damages, civil penalties and all other recoveries provided for under the FCA.

2.      Collectively, the Manufacturer Defendants and the Medicare Advantage Defendants shall hereinafter be referred to as "Defendants."

## I.    SUMMARY OF THE CASE

3.      Relators Robert Kane and Franklin W. West are whistleblowers with knowledge of Defendants' perpetration of widespread and ongoing fraud in which Defendants defrauded Medicare by exploiting the serious dangers posed by peripheral artery disease ("PAD").

4.      PAD is a disease which involves the gradual accumulation of plaque in the arteries that supply blood to the human body. This accumulation restricts or entirely blocks blood flow, and as a result, an individual's peripheral extremities (*e.g.,* hands and feet) do not receive sufficient blood. In the most severe cases, PAD can lead to amputation, and PAD also substantially increases an individual's risk of suffering a heart attack or stroke. Fortunately, PAD can be easily diagnosed through a variety of highly reliable methods and once diagnosed, PAD can typically be treated.

5.      The Manufacturer Defendants manufacture, promote, and/or distribute medical devices that purport to provide a cheap, fast, and reliable method of diagnosing PAD. These devices employ photoplethysmography, a type of technology that attempts to measure blood flow and that, according to the Manufacturer Defendants, can determine whether an individual

1

suffers from PAD. In reality, these devices are extremely inaccurate with respect to diagnosing PAD and result in both false positive and false negative diagnoses of PAD. Beyond promoting unreliable devices, the Manufacturer Defendants have repeatedly assured their customers and potential customers that use of their devices are covered by Medicare, and based on this representation, the Manufacturer Defendants promote the use of their device as a potent revenue generator. In reality, federal regulations expressly preclude Medicare coverage for services involving photoplethysmography.

6.      The Medicare Advantage Defendants submitted separate false claims to the Government, causing additional financial harm to government healthcare programs. Specifically, the Medicare Advantage Defendants used the Manufacturer Defendants' inaccurate devices to diagnose patients with PAD, which led to patients being diagnosed with PAD who previously had not been diagnosed with PAD. As a consequence, such patients had a PAD diagnosis code added to their medical profile. This diagnosis code was then falsely submitted by the Medicare Advantage Defendants to the Government, which led the Medicare Advantage Defendants to receive increased payments to which they were not entitled.

## II.    THE PARTIES

7.      Semler is a medical device manufacturer that is incorporated and maintains its principal place of business in Oregon.

8.      C.R. Bard, Inc. is a medical device manufacturer that is incorporated and maintains its principal place of business in New Jersey. Bard Peripheral Vascular, Inc. is a division of C.R. Bard, Inc. and is a medical device manufacturer that is incorporated and maintains its principal place of business in Arizona.

9.      BioMedix is a medical device manufacturer that is incorporated and maintains its principal place of business in Minnesota.

10.     UnitedHealth Group, Inc. is a diversified entity that, as pertinent to this action, provides health insurance through UnitedHealthcare Insurance Company.  UHG is incorporated in Delaware and maintains its principal place of business in Minnesota.

11.     Medicare Advantage Plans John Does 1-50 are as-yet-unidentified Medicare Advantage Plans that are using the Manufacturer Defendants' devices to diagnose patients with PAD and that are subsequently presenting false claims to the Government.

12.     Relators Robert Kane and Franklin W. West jointly have over 70 years of experience in non-invasive vascular diagnostics and cardiovascular health and bring this action on behalf of the United States.

13.     Relator Kane has more than 35 years of experience in cardiovascular medicine in both invasive and non-invasive surgical and imaging modalities.  Relator Kane has served on many local and national healthcare committees, and through this service, has gained a nationwide reputation for his commitment to clinical excellence in the cardiovascular medical community.  He has represented numerous physicians across the United States in support of reimbursement policies.  Relator Kane is responsible for several reports of the United States Department of Health & Human Services' Office of the Inspector General ("HHS-OIG"), and is a recipient of the HHS-OIG Integrity Award.

14.     Relator West has more than 40 years of experience in both invasive and non-invasive surgical and diagnostic testing modalities. He is a recipient of the HHS-OIG Integrity Award and worked as an independent contractor for the United States Department of Justice as well as several Medicare contractors including Pennsylvania Blue Cross.  He was a member of the HCFA Carrier Medical Director's Local Medical Review Policy (LMRP) Committee for the development of uniform template policy for non-invasive vascular testing and worked with the

HCFA Medical Director of Payment Policy on revision of the AMA Current Procedural Terminology codes for non-invasive vascular testing. He has held numerous volunteer positions with professional associations including President of the Society of Vascular Technology and Second Vice President of the American Institute of Ultrasound in Medicine. He is a Registered Nurse and Registered Vascular Technologist and has been certified in Healthcare Compliance, Vascular Nursing, and as a Vascular Specialist. While a Visiting Research Scientist at the Institute of Biomedical Engineering and Science at Drexel University, he was the Principle Investigator on a DHHS – SBIR Phase II Grant on the development of a device for the detection of blood flow in breast cancer. More recently, he was employed as the Chief Compliance Officer and Director of Practice Support and Health Policy for the Society for Vascular Ultrasound.

15.     Relators have standing to bring this action pursuant to 31 U.S.C. §3730(b)(1).

16.     Relators' complaint is not based on public disclosures – within the meaning of 31 U.S.C. § 3730(e)(4)(A) – of the allegations or transactions discussed herein. Relators are original sources, within the meaning of 31 U.S.C. Section 3730(e)(4)(B), of the information provided herein.

17.     Prior to the filing of this action – and prior to any public disclosure within the meaning of 31 U.S.C. § 3730(e)(4)(A) – Relators voluntarily disclosed to the United States the information on which the allegations or transactions discussed herein are based.

## III.    JURISDICTION AND VENUE

18.     Jurisdiction is founded under 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331, 1345.

19.     Personal jurisdiction and venue are proper in the Middle District of Florida pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because at least one of Defendants transacts and has transacted business in the Middle District of Florida.

4

## IV.    THE FALSE CLAIMS ACT

20.    The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

21.    The FCA "establishes a scheme that permits either the Attorney General or a private party to initiate a civil action alleging fraud on the Government," U.S. ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928, 932 (2009) (citations omitted), and "imposes significant penalties on those who defraud the Government." Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1995 (2016).

22.    The FCA provides, *inter alia,* that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

23.    Thus, under 31 U.S.C. § 3729(a)(1)(A), the FCA is violated not only by a person who submits a false claim, but also by one who *causes another* to submit a false claim. U.S. ex rel. Bunk v. Birkart Globistics GmBH & Co., 2011 WL 5005313, at *7 n. 10 (E.D. Va. Oct. 19, 2011) (quoting jury instruction on "Cause False Claim to Be Filed"); U.S. ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242-245 (3rd Cir. 2004) (applying "substantial factor" and "normal consequence" test); U.S. ex rel. Feldman v. City of New York, 808 F. Supp. 2d 641, 650 (S.D.N.Y. 2011) (citing Zimmer with approval); U.S. ex rel. Freedman v. Suarez-Hoyos, 2012 WL 4344199, at *8 (M.D. Fla. Sept. 21, 2012).

24.    The terms "knowing" and "knowingly" mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the

truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

25.    Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

26.    The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

27.    "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

28.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. See 28 C.F.R. § 85.3.

29.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 and 81 Fed. Reg. 42491 (2016), the civil monetary penalties under the FCA were adjusted to $10,781 to $21,563 for violations occurring on or after November 2, 2015. See 28 C.F.R. § 85.5.

## V.    BACKGROUND

### A.    Peripheral Artery Disease & Traditional Diagnostic Tests

30.    PAD is "a disease in which plaque builds up in the arteries that carry blood to [an individual's] head, organs, and limbs."[1]

31.    As a result of the plaque build-up, blood flow is limited or entirely blocked, resulting in insufficient blood supply to an individual's extremities. Id.

32.    PAD and its effects are illustrated in the following graphic provided by the National Institutes of Health:[2]



---

[1] NAT'L INSTITUTES OF HEALTH – NAT'L HEART, LUNG, AND BLOOD INSTITUTE, *What is Peripheral Artery Disease, available at* https://www.nhlbi.nih.gov/health/health-topics/topics/pad.

[2] NAT'L INSTITUTES OF HEALTH – NAT'L HEART, LUNG, AND BLOOD INSTITUTE, *What is Peripheral Artery Disease, available at* https://www.nhlbi.nih.gov/health/health-topics/topics/pad.

33.    PAD increases an individual's risks of coronary heart disease, heart attack, and stroke.[3]

34.    PAD can result in total loss of circulation of blood, which may lead to amputation of the affected limbs. Id.

35.    PAD "is easily diagnosed in a simple, painless way." Id. (citation omitted).

36.    Medical professionals use the following diagnostic tests to evaluate whether an individual suffers from PAD:

- Ankle-brachial index (ABI). "The ABI compares blood pressure in your ankle to blood pressure in your arm. This test shows how well blood is flowing in your limbs."

- Doppler Ultrasound. "A Doppler ultrasound looks at blood flow in the major arteries and veins in the limbs. During this test, a handheld device is placed on your body and passed back and forth over the affected area. A computer converts sound waves into a picture of blood flow in the arteries and veins."

- Treadmill Test. "A treadmill test can show the severity of symptoms and the level of exercise that brings them on. You'll walk on a treadmill for this test. This shows whether you have any problems during normal walking."

- Magnetic Resonance Angiogram. "A magnetic resonance angiogram (MRA) uses magnetic and radio wave energy to take pictures of your blood vessels. This test is a type of magnetic resonance imaging (MRI). An MRA can show the location and severity of a blocked blood vessel."

- Arteriogram. "An arteriogram provides a "road map" of the arteries. Doctors use this test to find the exact location of a blocked artery. For this test, dye is injected through a needle or catheter (tube) into one of your arteries."

- Blood tests. "Your doctor may recommend blood tests to check for PAD. risk factors. For example, blood tests can help diagnose conditions such as diabetes and high blood cholesterol."[4]

---

[3] AMERICAN HEART ASSOCIATION, About Peripheral Artery Disease (PAD), available at http://www.heart.org/HEARTORG/Conditions/More/PeripheralArteryDisease/About-Peripheral-Artery-Disease-PAD_UCM_301301_Article.jsp#.V-FKICgrKUk.

[4] NAT'L INSTITUTES OF HEALTH, How Is Peripheral Artery Disease Diagnosed?, available at http://www.nhlbi.nih.gov/health/health-topics/topics/pad/diagnosis.

37.     The most commonly used diagnostic tests are the ankle-brachial index test and the Doppler ultrasound test.

38.     The ankle-brachial index test and the Doppler ultrasound test are widely regarded as highly accurate with respect to diagnosing PAD.

39.     PAD is a common medical condition affecting millions of Americans.

40.     Generally, once diagnosed, PAD can be successfully treated through a variety of means, including lifestyle changes, medications, and surgery.[5]

**B.     Photoplethysmography**

41.     Plethysmography is "the measurement and recording (by one of several methods) of changes in the size of a body part as modified by the circulation of blood in that part."[6]

42.     Photoplethysmography, sometimes known as photoelectric plethysmography (collectively, "PPG"), is a type of plethysmography in which an infrared light signal is beamed into an individual's body to measure the changes in tissue blood flow.

**C.     The CPT Coding System**

43.     The Current Procedural Terminology ("CPT") coding system is used by medical providers to report services and seek reimbursement for same. See U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 709 n. 9 (10th Cir. 2006) ("CPT codes refer to 'Current Procedural Technology' codes, which describe medical services such as treatments, tests, and procedures, and are an accepted means of reporting such medical services to government and health insurance programs."); United States v. Fadul, 2013 WL 781614, at *1 (D. Md. Feb.

---

[5]    MAYO CLINIC, Peripheral artery disease (PAD) – treatment, available at http://www.mayoclinic.org/diseases-conditions/peripheral-artery-disease/diagnosis-treatment/treatment/txc-20167509.
[6]    CENTER FOR MEDICARE AND MEDICAID STUDIES, Medicare National Coverage Determinations Manual -- 20.14 – Plethysmography, at 46, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ncd103c1_part1.pdf.

28, 2013) ("To reimburse health care providers, private and public insurers (including Medicare and Medicaid) use an alphanumeric coding system established by the American Medical Association and published in the Current Procedural Terminology.").

44.    The American Medical Association creates CPT codes and describes them as:

> Current Procedural Terminology . . . is a listing of descriptive terms and identifying codes for reporting medical services and procedures. The purpose of CPT is to provide a uniform language that accurately describes medical, surgical, and diagnostic services, and thereby serves as an effective means for reliable nationwide communication among physicians and other healthcare providers, patients, and third parties.[7]

45.    The appropriate CPT codes for Doppler technology include 93922, 93923, and 93924.

**D.    Medicare National Coverage Determinations**

46.    Medicare is a health insurance program funded by the federal government that provides health insurance benefits to (1) individuals who are 65 or older, (2) individuals with certain disabilities, and (3) individuals suffering from end stage renal disease. See 42 U.S.C. § 1395c.

47.    Medicare does not cover "expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

48.    The Secretary of Health and Human Services is authorized to determine "whether a particular medical service is 'reasonable and necessary'" and to determine "the means by which

---

[7] AMERICAN MEDICAL ASSOCIATION, *CPT® Process - How a Code Becomes a Code Why is CPT Important?* http://www.ama-assn.org/ama/pub/physician-resources/solutions-managing-your-practice/coding-billing-insurance/cpt/cpt-process-faq/code-becomes-cpt.page.

she implements her decision, whether by promulgating a generally applicable rule or by allowing individual adjudication." Heckler v. Ringer, 466 U.S. 602, 617 (1984).

49.    The Secretary of Health and Human Services performs these responsibilities through the Centers for Medicare & Medicaid Services ("CMS").

50.    CMS "typically contracts with public or private 'carriers' to assist in the administration of the Medicare programs" and "coverage decisions are commonly made by such carriers on a case-by-case basis." Estate of Aitken v. Shalala, 986 F. Supp. 57, 59 (D. Mass. 1997).

51.    National coverage determinations ("NCD") are "determination[s] . . . with respect to whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395y; see also 42 C.F.R. § 405.1060(a)(1).

52.    CMS "occasionally issues 'national coverage determinations' in situations where there is substantial disagreement in the medical community about the effectiveness or safety of a procedure or where there is inconsistency in coverage by various Medicare carriers." Shalala, 986 F. Supp. at 59; see also Woodfill v. Sec'y of Health & Human Servs., 557 F. App'x 473, 474 (6th Cir. 2014) ("Medicare covers 'reasonable and necessary' services, and the Secretary may issue national coverage determinations that describe the services satisfying these requirements."); Erringer v. Thompson, 371 F.3d 625, 628 (9th Cir. 2004) ("The Secretary adopts NCDs to exclude certain items and services from coverage on a national level that are not 'reasonable and necessary' under the agency's interpretation of the Medicare statute."); United States v. Abbott Labs., 2016 WL 80000, at *3 (N.D. Tex. Jan. 7, 2016) ("CMS has the authority to make Medicare coverage eligibility determinations for medical devices on a nationwide basis. When it makes a rule regarding the scope of coverage for a particular device, CMS issues a National Coverage Decision.").

11

53.     An NCD can "grant[], limit[], or exclud[e] Medicare coverage for a specific medical service, procedure or device." Erringer v. Thompson, 189 F. Supp. 2d 984, 987 (D. Ariz. 2001).

54.     An NCD is "binding throughout the Medicare system." Id.; see also 42 U.S.C. § 1395f(c)(3)(B)(ii)(I); 42 C.F.R. § 405.1060(a)(4); Erringer, 371 F.3d at 628 (explaining that NCDs "are binding on all Medicare contractors nationwide").

### E.     Medicare Declares PPG to be Non-Reimbursable

55.     Medicare has repeatedly refused to provide reimbursement for the use of PPG technology.

56.     On November 15, 1980, CMS's predecessor agency issued NCD 20.14 for plethysmography, which it describes as a medical procedure that "involves the measurement and recording (by one of several methods) of changes in the size of a body part as modified by the circulation of blood in that part."[8]

57.     NCD 20.14 is divided into two categories: 1) Category I, which provides that certain forms of plethysmography are covered and (2) Category II, which provides that certain forms of plethysmography are not covered. Id. at 46-47.

58.     NCD 20.14 explains that "[t]he procedures in Category II are still considered experimental *and are not covered at this time.*" Id. at 46 (emphasis added).

59.     PPG is listed as a Category II procedure in NCD 20.14. Id. at 47.

60.     NCD 20.14 provides that PPG "is considered useful only in determining whether or not a pulse is present and does not provide reproducible measurements of blood flow." Id.

---

[8] CENTER FOR MEDICARE AND MEDICAID STUDIES, Medicare National Coverage Determinations Manual -- 20.14 – Plethysmography, at 46, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ncd103c1_part1.pdf.

61.     NCD 20.14 has never been rescinded and remains in effect today.

62.     NCD 20.14 expressly precludes Medicare coverage for PPG.

## VI.     FACTUAL ALLEGATIONS

### A.     The Use of PPG Technology to Diagnose PAD is Cheaper and Faster than Using Traditional (and Reliable) Diagnostic Methods

63.     The above-described traditional diagnostic tests, including the use of Doppler technology, are reimbursable methods to diagnose PAD.

64.     As described below, the Manufacturer Defendants promote use of their PPG devices as easier, quicker, and less expensive than the use of Doppler technology for diagnosing PAD.

65.     Medicare (and other government payers) pay out the same amount for any service that fits within a specific CPT code, irrespective of the actual cost to a medical provider to provide the service.

66.     Medical providers are consequently incentivized to perform the most inexpensive and least time-consuming services that qualify for a specific CPT code.

67.     The Manufacturer Defendants' PPG products are much less expensive than the traditional diagnostic tests.

68.     The Manufacturer Defendants' PPG products are much faster than the traditional diagnostic tests and can "diagnose" PAD within as little as five minutes, while traditional diagnostic tests take approximately 30-45 minutes.

69.     A PPG test can be performed by a medical assistant or aide, while the traditional diagnostic tests generally require a specialized vascular technologist who must receive extensive training.

70.     Accordingly, by billing use of the Manufacturer Defendants' PPG products at the same CPT codes used for performance of the traditional diagnostic tests, providers can and do substantially increase their profit margins.

**B.      Photoplethysmography Is Inaccurate and Unreliable**

71.     Contrary to Defendants' below-described representations, PPG products are unreliable with respect to diagnosing whether an individual suffers from PAD.

72.     Clinical evaluations have resulted in findings that devices using PPG technology, including Defendants' PPG products, result in extremely low accuracy rates as to whether an individual has PAD.

73.     Relator Kane is a consultant to Navix Diagnostix, Inc. ("Navix").

74.     In February 2016, Relator Kane and his colleagues at Navix performed a clinical evaluation of QuantaFlo, which as described below, is a PPG-driven device manufactured by Semler.

75.     Relator Kane is a consultant to Navix and was closely involved in the clinical evaluation of QuantaFlo.

76.     In the QuantaFlo study, 24 individuals were referred with abnormal QuantaFlo findings suggesting PAD.

77.     Relator Kane directed his colleagues to proceed to examine all 24 patients who were referred for PAD using QuantaFlo.

78.     10 patients (41.7%) had normal ABI's and no significant abnormal findings by duplex ultrasound in the lower extremities.

79.     8 patients had erroneous ABI's due to non-compressible vessels, which occurs most frequently in diabetic patients and is known as Möckeberg's Syndrome. Accordingly, the accuracy of QuantaFlo could not be evaluated by comparison to ABIs with respect to these patients.

However, of these 8 patients, duplex ultrasound demonstrated no hemodynamically significant abnormal findings in six patients.  2 of these patients were accurately identified as abnormal.

80.    Correlation was noted between QuantaFlo and ABI with respect to abnormal findings for the remaining 6 patients.

81.    Consequently, the QuantaFlo findings were falsely positive in 16 of 24 patients (66.6%) and accurately positive in only 8 of 24 patients (33.3%).

82.    Relator Kane ordered the exams not be billed to Medicare.

83.    Like QuantaFlo, the other products at issue in this lawsuit rely on PPG technology in making PAD diagnoses.

### C.    Defendants Develop, Manufacture, Distribute, Promote and Utilize PPG Devices for Diagnosis of PAD

#### 1.    Allegations Specific to BioMedix

##### a.    *BioMedix Products*

84.    In or around 1999, Relator Kane was working for a company called Phoenix Cardiovascular.

85.    In or around 1999, John Romans, the president of BioMedix, contacted Relator Kane about purchasing a BioMedix product that Mr. Romans represented could be used by medical providers to reliably diagnose whether an individual suffered from PAD.

86.    Mr. Romans described the device as a pulse volume recording machine.

87.    Mr. Romans said that medical providers could bill insurance providers, including Medicare, for use of the product.

88.    Mr. Romans did not disclose that the device utilized PPG technology.

89.    Based on Mr. Romans' representations, Phoenix Cardiovascular ordered several of the devices.

15

90.     At the time, Phoenix Cardiovascular and Relator Kane were unaware that the device utilized PPG technology, given Mr. Roman's description of the device at the earlier meeting as a reimbursable pulse volume recording machine and Mr. Romans' failure to disclose that the device utilized PPG technology.

91.     Phoenix Cardiovascular took delivery of one of the BioMedix devices and began employing it at Christ Hospital in Jersey City, NJ under a contract with the hospital to perform vascular services.

92.     Shortly thereafter, Relator's Kane's employee who was assigned to Christ Hospital called Relator Kane and advised that the BioMedix device was extremely inaccurate with respect to diagnosing PAD and that is often resulted in false positive diagnoses of PAD.

93.     Relator Kane contacted BioMedix, which sent product specialist William Rogers to Christ Hospital to ensure that the device was working properly.

94.     Mr. Rogers was unable to resolve the concerns of Christ Hospital, Phoenix Cardiovascular, and Relator Kane.

95.     Consequently, Phoenix Cardiovascular cancelled its order but still had to pay for the one BioMedix device that it had already received.

96.     Phoenix Cardiovascular retired the one BioMedix device it had received and never utilized it again.

97.     Mr. Romans later called Relator Kane and advised that Phoenix Cardiovascular was contractually required to take delivery of the other BioMedix devices for which it had submitted a purchase order, notwithstanding that the first device had proven extremely inaccurate.

98.     Relator Kane informed Mr. Romans that Phoenix Cardiovascular would not accept delivery of the remaining BioMedix devices because of the inaccuracy of the fist device.

99.     In 2004, BioMedix launched a new device employing PPG technology called PADnet.

100.     PADnet is the successor to the device that Phoenix Cardiovascular previously ordered from BioMedix.

101.     BioMedix obtained Section 510(K) clearance[9] from the Food and Drug Administration ("FDA") for PADnet in October 2004.

102.     According to BioMedix, PADnet "is a non-invasive physiologic study" and "includes bilateral segmental pressures at multiple levels, and Pulse Volume Recordings (PVR) which provide waveforms to analyze the quality of blood flow" and "PVR waveforms are plethysmographic tests which provide qualitative information."[10]

103.     According to BioMedix, PADnet "use[s] automated pressure cuffs and plethysmography to get pulse volume waveforms for the knee down to the toe."[11]

104.     BioMedix promotes PADnet as a reliable diagnostic tool with respect to evaluating whether an individual suffers from PAD.

105.     According to BioMedix, PADnet is "a patented vascular testing device and collaborative care platform that enables earlier disease detection and accurate risk assessment for the following critical vascular conditions . . . Peripheral Artery Disease."[12]

---

[9] The 510(K) clearance process refers to the FDA's review and approval of devices that are "substantially equivalent" to an existing device. Clearance permits the manufacturer of the substantially equivalent device to market it without going through the FDA's arduous pre-market approval process for new devices. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 478 (1996).

[10] BIOMEDIX, PADnet Testing Device, available at http://www.biomedix.com/products-PADnet.php#1.1.

[11] BIOMEDIX, Introduction to BioMedix PADnet, YouTube Video, at 0:31-:39 (Oct. 20, 2011), available at https://www.youtube.com/watch?v=2GlPtDHLpvA.

[12] BIOMEDIX, PADnet Testing Device, available at http://www.biomedix.com/products-PADnet.php#1.1.

106.    BioMedix created a video advertisement for PADnet, which provides that PADnet is "designed to detect peripheral artery disease in a variety of frontline care settings."[13]

107.    BioMedix promotes PADnet as non-invasive and inexpensive relative to the above-describe traditional tests used to diagnose PAD.

108.    According to BioMedix, PADnet "eliminates the need for Doppler, a technician-dependent means of obtaining Ankle-Brachial Indexes (ABI)."[14]

109.    According to BioMedix:

> Alternatives to PADnet include handheld devices and duplex ultrasound or MRI. Use of handheld devices which do not produce hard copy, or a record of bi-directional vascular flow is considered part of the patients physical exam and will not be separately reimbursed. Duplex Ultrasound or MRI, on the other hand, while providing excellent results is expensive, operator dependant [sic], and must be performed in a vascular lab. Bilateral segmental pressures and PVR testing using PADnet is easily performed by trained personnel.[15]

110.    Since the initial PADnet was released in 2004, BioMedix has released at least two new generations of the products: PADnet+ and PADnet 2.0.

111.    BioMedix obtained Section 510(K) clearance from the FDA for PADnet+ in 2007.

112.    BioMedix obtained Section 510(K) clearance from the FDA for PADnet 2.0 in 2012.

113.    As relevant to this lawsuit, PADnet+ and PADnet 2.0 are materially identical to the original PADnet, and this Complaint collectively refers to these products as "PADnet" unless otherwise indicated.

---

[13] BioMedix, FHA staff and doctor PADnet Training, YouTube Video, at 0:07-0:15 (Apr. 7, 2014) available at https://www.youtube.com/watch?v=FR1aJvs_ivI.
[14] BioMedix, History, available at http://www.biomedix.com/history.php.
[15] BioMedix, PADnet Testing Device, available at http://www.biomedix.com/products-PADnet.php#1.1.

### b.    Relators' Investigation of PADnet

114.    Relators Robert Kane and Franklin W. West jointly have over 70 years of experience in non-invasive vascular diagnostics and cardiovascular health.

115.    Through their work in the field of PAD detection, Relators obtained a BioMedix promotional brochure, which plainly shows that PADnet was promoted by BioMedix as reimbursable under CPT codes 93922, 93923, and 93924.

116.    The brochure provides: "Claims submission for PADnet+ tests meet the requirements for CPT® codes 93922, 93923 and 93924 (optional post-exercise testing), given approved physical signs and symptoms" and therefore that PADnet "provid[es] fair financial return."

117.    Through this and other means, BioMedix has directly represented to medical providers, through its sales representatives and other employees, that services using PADnet are reimbursable by Medicare.

### c.    The Relators' Expert Evaluation of PADnet and NCD 20.14

118.    Relators were part of the team which initially drafted and implemented NCD 20.14 back in 1980.

119.    Relators are both experts in the field of PAD diagnosis and the utilization of PPG technology.

120.    Relators have carefully evaluated the PADnet devices and can state that PADnet devices utilize PPG technology within the meaning of NCD 20.14.

121.    Accordingly, pursuant to NCD 20.14, the use of PADnet is not reimbursable by Medicare. Notwithstanding that fact, BioMedix is promoting PADnet as being reimbursable for the diagnosis of PAD.

> **d.    The CPT Coding Expert's Evaluation of PADnet and CPT Codes 93922, 92923, and 93924**

122.    Relators retained Dr. Harry Goldsmith, a doctor of podiatric medicine and a certified CPT coding expert with 40 years of experience in medical coding and quality assurance, to review PADnet and to determine whether, in his expert opinion, use of PADnet is reimbursable under CPT codes 93922, 92923, and 93924.

123.    Dr. Goldsmith concluded that use of PADnet is not reimbursable under CPT codes 93922, 92923, and 93924.

> **2.    Allegations Specific to Semler**

> **a.    Semler's Devices – FloChec and QuantaFlo**

124.    Semler developed a device called FloChec.

125.    FloChec utilizes PPG technology.

126.    Herbert J. Semler is the co-founder of Semler, has served in a variety of leadership positions, and currently serves on the Board of Directors.

127.    Mr. Semler was previously affiliated with other entities, including Advanced Vascular Technologies, Inc. and Advanced Vascular Dynamic, Inc. (collectively, "Advanced Vascular.").

128.    In February 2010, Mr. Semler submitted a summary to the FDA in connection with the 510(K) clearance process for FloChec. **Exhibit 1.**

129.    The summary lists the name of the device as the "FloChec Photoplethysmography Device" and lists the tradename of the device as the "FloChec™ Photoplethsymographic Device." Id.

130.    The summary states:

> The FloChec Plethysmograph Device (PPG) is similar to the PPCG portion of the Hokanson EC-6 but does not include a strain gauge

20

PPG function that is included in the EC-6. The FloChec Sensor is similar to that of the Parks' Mini-Lab which used a single wave length IRI emitter in the sensor. The device is not sterile. Use of the FloChec device by a medical practitioner allows visualizing of the blood flow wave forms in the extremities. In viewing the effects on the wave forms as a result of events such as direct external pressure being applied proximal to the sensor. FloChec Photoplethysmography is intended for use to provide visualization and evaluation of the blood flow wave form in an extremity. Testing was conducted to determine if the FloChec Photoplethysmography Device provides a visual, representation of the PPG wave form in the extremities. It was concluded that that FloChec device is equivalent to the predicate device.

Id.

131.    Advanced Vascular obtained Section 510(K) clearance for FloChec from the FDA in February 2010.

132.    The FDA's 510(K) clearance letter describes FloChec as a "photoplethsmography device" that is indicated "[t]o monitor relative blood flow changes distal to the occlusion of a brachial, radial, ulnar, or femoral artery." **Exhibit 2.**

133.    Advanced Vascular assigned any rights it had in FloChec to Semler.

134.    In 2015, Semler released QuantaFlo, the next generation of FloChec.

135.    QuantaFlo utilizes PPG technology.

136.    Semler obtained Section 510(K) clearance for QuantaFlo from the FDA in March 2015.

137.    The QuantaFlo user manual describes QuantaFlo as:

The QuantaFlo system provides bilateral, non-invasive physiologic studies of upper and lower extremity arteries (i.e., calculate ankle/brachial indices below distal posterior tibial and anterior tibial/dorsal pedis arteries with hard-copy waveform recording and blood volume plethysmograph measuring changes at multiple levels). QuantaFlo uses an optical sensor to assess the blood volume in an extremity. QuantaFlo displays a signal, which is directly related to the blood volume on a Volume Plethysmography Chart.

> Based on these measurements, QuantaFlo calculates the probability
> of peripheral arterial disease.

138.    Semler previously promoted FloChec and currently promotes QuantaFlo as reliable

diagnostic tools with respect to evaluating whether an individual suffers from PAD.

### b.    Relators' Investigation of FloChec and QuantaFlo

139.    In Semler's marketing materials, it describes FloChec as a "new reimbursable

office diagnostic test you can perform quickly and easily with no capital equipment purchase and

no specialized personnel." **Exhibit 3** at 2 (emphases original).

140.    In March 2014, a physician named Dr. Salvatore J. Tirrito gave a presentation at

the New Cardiovascular Horizons (NCVH)[16] conference and promoted FloChec as a method to

help "increase your daily practice revenue." **Exhibit 4.**

141.    The presentation addresses the CPT codes that can purportedly be used to bill

Medicare for services using FloChec and lists CPT codes 93922 and 93923.  Id.

142.    The presentation claims that FloChec is "low cost to operate with a ***pretty solid***

***reimbursement***." Id. (emphasis added)

143.    The presentation includes a chart highlighting a "revenue generating approach" to

PAD screening using FloChec.  Id.

144.    The presentation provides an example of the revenue-generating capabilities of

FloChec in disclosing that a particular clinic used FloChec to test 187 patients for PAD over the

course of a month.  Id. This clinic billed each of those tests to Medicare under CPT code 93923,

at a total sum of $52,234 and received $24,611 in return from Medicare, meaning that Medicare

---

[16] NCVH is an educational nonprofit foundation focused on multidisciplinary accredited conferences to advance the field of cardiovascular care using endovascular technologies, pharmacotherapy treatments, peripheral interventions and amputation prevention techniques. See http://www.ncvh.org/meetings/annual-conference-2015/.

reimbursed each test at about $131. Id. With the cost of the FloChec machine lease as low as $400 per month, the presentation asserts that using FloChec is a solid "revenue generating approach" for providers. Id.

145.    The presentation also includes a chart comparing FloChec with the traditional tests used to diagnose PAD and points out that FloChec takes less than 5 minutes and thus can earn substantially higher revenues than the traditional tests that takes substantially longer to administer. Id.

146.    Semler created a document entitled "Frequently Asked Questions about FloChec Coverage." The document provides:

> ### Is there a specific CPT code for the FloChec?
>
> As with nearly all new technologies, **the FloChec procedure does not have a specific CPT code**. As we understand the process of reimbursement for new devices, based on dozens of years creating new products, obtaining FDA clearances and bringing them to the physician community, it is preferable, when applicable to use existing CPT codes rather than create new codes. In keeping with this reasoning, **codes are written with ambiguity and lack of specificity to encompass more than a particular product**. If each product had its own code, the system would be overwhelmed.

**Exhibit 5** at 1 (emphasis added) (footnote omitted).

147.    While Semler acknowledges that there is no CPT code which specifically authorizes providers to obtain reimbursement from Medicare for FloChec, the document clearly suggests that it is appropriate to use existing CPT codes, including 93922, to bill for FloChec.

148.    Specifically, Semler misleads medical providers into believing that "codes are written with ambiguity and lack of specificity to encompass more than a particular product" and then asserts that providers should submit claims for reimbursement under CPT code 93922. Id.

149.    Semler states:

> *How does this [ambiguity] relate to seeking a unique CPT code for FloChec?*

> FloChec reads very closely to CPT code 93922… In our experience, the read of CPT code 93922 is extraordinarily consistent with the function of FloChec, so much so that there would be no point in applying for a new code.

Id.

150.    Semler places the definition of CPT code 93922 next to its description of FloChec to make its point.  Id.

151.    Semler substantiates its deceptive statement by affirming that submitting claims under CPT codes 93922 works and will result in reimbursement.  It states that its "customers have been submitting appropriate ICD 9 codes with the CPT code 93922 designations and are being paid for their services." Id. at 2.

152.    To further illustrate the revenue-generating potential of FloChec, Semler advertises that "[i]n the case of using CPT 93922, approximately three procedures per month pay for the rental fee" and that "[g]iven the scope of the PAD problem . . . , we believe the reimbursement situation is more than adequate to achieve practice revenues and provide better clinical care at an affordable price.  Id.

153.    Moreover, the document does not reveal that NCD 20.14 actually prohibits reimbursement for PPG devices such as FloChec and QuantaFlo.

154.    The QuantaFlo user manual provides: "QuantaFlo is intended to aid clinicians in the diagnosis and monitoring of Peripheral Arterial Disease."

155.    In an August 2016 corporate presentation, Semler said that there was "[n]o cost efficient or time efficient means for insurance plans and physicians to identify these patients" with PAD and that its products are "[f]aster," "[m]ore practical to use," "[m]ore accurate," and "[l]ess expensive."

156.    The presentation further provides: "Semler's QuantaFlo™ vascular disease test can be performed by a medical aide in less than five minutes. There is no longer a need for a vascular specialist. The primary care physician is spared substantial time and paperwork, which may be better spent on patient care management."

157.    Through these acts, Semler has directly represented to medical providers, through its sales representatives and other employees, that services using FloChec and QuantaFlo are reimbursable by Medicare.

158.    Similarly, Semler has directly represented to medical providers, through its sales representatives and other employees, that services using FloChec and QuantaFlo satisfy the requirements of CPT codes 93922, 93923 and 93924.

### c.    The Relators' Expert Evaluation of FloChec, QuantaFlo and NCD 20.14

159.    As noted above, Relators were part of the team which initially drafted and implemented NCD 20.14 back in 1980.  They are both experts in the field of PAD diagnosis and the utilization of PPG technology.

160.    Relators have carefully evaluated the FloChec and QuantaFlo devices and can state that that these devices utilize PPG technology within the meaning of NCD 20.14.

161.    Accordingly, pursuant to NCD 20.14, the use of FloChec and QuantaFlo to diagnose PAD is not reimbursable by Medicare.  Notwithstanding that fact, Semler promoted FloChec and QuantaFlo as being reimbursable for the diagnosis of PAD.

### d.    The CPT Coding Expert's Evaluation of FloChec and QuantaFlo and CPT Codes 93922, 92923, and 93924

162.    Relators retained Dr. Harry Goldsmith, a doctor of podiatric medicine and a certified CPT coding expert with 40 years of experience in medical coding and quality assurance,

to review FloChec QuantaFlo and to determine whether, in his expert opinion, use of FloChec and QuantaFlo is reimbursable under CPT codes 93922, 92923, and 93924.

163.    Dr. Goldsmith concluded that use of FloChec and QuantaFlo is not reimbursable under CPT codes 93922, 92923, and 93924.

### 3.    Allegations Specific to C.R. Bard

164.    Bard manufactures several products used to treat PAD or to mitigate the effects of PAD.

165.    In August 2012, Bard signed a cross-promotion and third-party distribution agreement with Semler under which Bard marketed and distributed FloChec to medical providers for the purpose of using FloChec to diagnose PAD.

166.    Bard now markets and distributes QuantaFlo under that agreement.

167.    Bard has a motive to promote and distribute FloChec and QuantaFlo because such activities increase the number of PAD diagnoses, which in turn facilitate greater sales of Bard products.

168.    For example, Bard manufactures stents which are used to reopen blocked arteries and to support healthy blood flow.

169.    Bard is a large manufacturer and distributor of stents, including under the LIFESTENT® brand, and specifically promotes stents as useful in treating PAD.

170.    As a further example, catheters are used in connection with PAD treatment, including angioplasty, stent placement, and atherectomy.

171.    Bard is a large manufacturer and distributor of catheters, including under the CROSSER® brand, and specifically promotes catheters as useful in treating PAD.

172.    Bard previously promoted FloChec and currently promotes QuantaFlo as reliable diagnostic tools with respect to evaluating whether an individual suffers from PAD.

173.    Bard previously promoted FloChec and currently promotes QuantaFlo as non-invasive and inexpensive relative to the above-describe traditional tests used to diagnose PAD.

174.    Specifically, Bard claims that these devices are a faster and easier way for physicians to detect PAD.

175.    In a November 5, 2012 letter, the Vice President of Bard Peripheral Vascular, John Van Vleet, states: "The FloChec™ digital ABI device is normally coded under CPT 93922 or potentially 93924 if stress testing is also performed." **Exhibit 6.**

176.    The letter then provides the definition of CPT code 93922 and stated: "FloChec™ meets each word of the definition as it is a limited, bilateral, noninvasive, physiologic study of the upper and lower extremity arteries." Id.

177.    Bard has directly represented to medical providers, through its sales representatives and other employees, that diagnosing PAD using FloChec and QuantaFlo are reimbursable by Medicare, in direct contravention of NCD 20.14.

178.    Bard has directly represented to medical providers, through its sales representatives and other employees, that diagnosing PAD using FloChec and QuantaFlo satisfy the requirements of CPT codes 93922, 93923 and 93924, which is in direct contrast to the definitions of those CPT codes.

### 4.    Allegations Common to Semler and C.R. Bard

179.    Vascular and Leg Center is a medical provider in Bakersfield, CA that specializes in the treatment of PAD.

180.    Pursuant to the above-described agreement between Bard and Semler, Bard encouraged Vascular and Leg Center to purchase QuantaFlo units.

181.    Vascular and Leg Center asked Bard whether use of QuantaFlo is reimbursable.

182.    Bard referred Vascular and Leg Center to Semler.

183.    Semler told Vascular and Leg Center that use of QuantaFlo could be billed under CPT codes 92922 and 92923.

184.    Semler told Vascular and Leg Center that this information could not be put in writing.

### D.    The Manufacturer Defendants Deceptive Marketing Campaign was Extremely Successful

185.    The Manufacturer Defendants' deceptive marketing campaign was successful in enticing medical providers to purchase their PPGs products as revenue-generating mechanisms that could quickly and accurately diagnose whether an individual suffers from PAD.

186.    Medical providers, and particularly cardiologists and podiatrists, across the United States began utilizing the PPG devices promoted by the Manufacturer Defendants' for diagnosing PAD and continue to do so.

187.    As a result of the Manufacturer Defendants' scheme, medical providers and insurance carriers submit requests for reimbursement for services using Defendants' PPG products to Medicare notwithstanding the express prohibition of NCD 20.14.

188.    As a result of the Manufacturer Defendants' scheme, medical providers and insurance carriers submit requests for reimbursement for services using the Manufacturer Defendants' PPG products to Medicare using CPT codes 93922, 93923 and 93924 notwithstanding the inapplicability of these CPT codes.

### E.    Medicare Advantage Defendants

#### 1.    Background on the Medicare Advantage Program

189.    Medicare Advantage, formerly known as Medicare+Choice and sometimes known as Part C, is an alternative to traditional Medicare.

190.    Under Medicare Advantage, private entities called Medicare Advantage organizations ("MAO") directly provide coverage to Medicare beneficiaries and in return receive funding from the federal government. See generally 42 U.S.C. § 1395w-21 *et seq*.; 42 C.F.R. 422.1 *et seq*.

191.    MAOs are compensated by the federal government on a capitation basis. 42 U.S.C § 1395w-23(C)(1); 42 C.F.R. § 422.308(c).

192.    Capitation means that MAOs receive a "fixed monthly amounts for each enrollee." United States v. United Healthcare Ins. Co., 2016 WL 4205941, at *1 (9th Cir. Aug. 10, 2016); see 42 C.F.R. § 422.304.

193.    CMS calculates the payment for each enrollee based on various 'risk adjustment data,' such as an enrollee's demographic profile and the enrollee's health status, as reflected in the medical diagnosis codes associated with healthcare the enrollee receives." Id. at *1; see 42 C.F.R. § 422.308(c).

194.    "Physicians and other health care providers submit diagnosis codes to the Medicare Advantage organizations, which in turn submit them to CMS." United Healthcare Ins. Co., 2016 WL 4205941, at *2.

195.    A particularly significant factor in CMS's calculation of capitation payments is whether an enrollee suffers from a chronic condition, such as PAD, diabetes, kidney disease, cancer, and heart disease.

196.    MAOs convey whether an enrollee suffers from a disease by submitting diagnostic disease codes to CMS.

197.    Before October 1, 2015, these diagnostic codes were known as ICD-9 codes, and after October 1, 2015, these are known as ICD-10 codes. See generally Bonewitz v. Cigna Corp., completeness, and truthfulness of relevant data that CMS requests." 42 C.F.R. § 422.504(l).

198.    MAOs must further "certify that . . . the information relied upon by CMS in determining payment (based on best knowledge, information, and belief) is accurate, complete, and truthful." Id. at § 422.504(l)(1).

199.    A false positive diagnosis of PAD resulting from use of the Manufacturer Defendants' PPG products to an individual with a Medicare Advantage plan will result in a higher capitation payment without the insurance carrier incurring the additional costs of providing treatment to an individual who actually suffers from PAD.

200.    MAOs have an additional financial incentive to encourage medical providers to use Defendants' PPG products, which cost substantially less than the above-described traditional tests for diagnosing PAD, in that they retain the difference between a capitation payment and actual costs as profit.

201.    In 2003, Congress significantly expanded the availability of Medicare Advantage plans by enacting the Medicare Prescription Drug, Improvement and Modernization Act of 2003. See PL 108–173, 117 Stat 2066 (Dec. 8, 2003).

202.    Medicare enrollees are increasingly electing Medicare Advantage plans rather than traditional Medicare plans.

### 2.    The Role of the Medicare Advantage Defendants

203.    As part of its deceptive marketing campaign, Semler intentionally targeted MAOs.

204.    Semler recognized the lucrative opportunity presented by contracting with MAOs.

205.    Semler represented to MAOs that use of its PPG products to diagnose patients with PAD will result in increased diagnoses of PAD and thus higher capitation payments from CMS.

30

206.    By way of example, a former Semler employee contacted Relator Kane to ask whether Relator Kane could provide any contacts with MAOs.

207.    The former Semler employee advised Relator Kane that Semler was attempting to sell its PPG device to MAOs to screen beneficiaries for PAD.

208.    The former Semler employee said that Semler represented to MAOs that use of its PPG device as a screening mechanism for PAD would result in higher capitation payments from the government.[17]

209.    Consistent with the evidence from the former employee, a July 31, 2015 earnings call, Semler CEO Doug Murphy-Chutorian stated:

> *Our sales goals are, number one, initiate business relations with large insurance payors with Medicare Advantage patients.* . . . We added new customers including, as previously announced, our fourth of the top 15 health insurers that cover over 70% of all Medicare Advantage patients. We also initiated a pilot program at a fifth such of the larger health insurers. And our significant ramp in installation was also fueled by repeat business from existing clients who added to their numbers of our FloChec or vascular units that they had licensed from us.

**Exhibit 7** at 1-2 (emphasis added).

210.    Mr. Murphy-Chutorian went on to explain that Medicare Advantage carriers will benefit financially if they use FloChec because their chances of getting more money per patient from the government will increase:

> And the interesting thing though about what we do is, not that side of the business, it's the FloChec side of the business where you're trying to understand your risk and *you get extra payments from the government when a patient has vascular disease.* So, on those kind of cases, *typically if you find out that someone has vascular disease and, therefore, you can start preventing it, the uptick on payment*

---

[17] Subsequent to this conversation with Relator Kane, the former Semler employee left Semler because he believed (consistent with NCD 20.14) that the PPG device did not work.

*there could be $3,000 a year per patient.* So that's substantially what insurance plans and large groups are trying to do is trying to find those patients, make sure they get them into care programs.

Id. at 8 (emphasis added).

211.    In an August 2016 corporate presentation, Semler noted that the "[t]rend towards Fixed 'Capitated' Payment **is increasing** [with] 'Obamacare[,]' [and] Medicare Advantage." **Exhibit 8** at 15 (emphasis original).

212.    Semler was successful in meeting its "number one" sales goal of targeting MAOs.

213.    Semler contracts with at least four of the largest MAOs in the United States for the purchase of FloChec or QuantaFlo devices.

214.    Since at least 2014, Semler has contracted with UHG for the sale of FloChec and QuantaFlo units.

215.    Semler advertised to MAOs, including UHG, that they could receive increased capitation payments through using FloChec and QuantaFlo to diagnose individuals with PAD.

216.    UHG is one of the largest MAOs in the United States with over 3 million beneficiaries.

217.    UHG uses FloChec and QuantaFlo to classify beneficiaries with PAD.

218.    UHG encourages medical providers in its network to use FloChec and QuantaFlo to diagnose individuals with PAD.

219.    UHG submits the results of these tests to CMS in the form of diagnostic codes (ICD-9 or ICD-10 codes) as purported evidence that a beneficiary suffers from PAD.

220.    In submitting these diagnostic codes to CMS, UHG certifies that the "accuracy, completeness, and truthfulness" of the information and that the information is "accurate, complete, and truthful." See 42 C.F.R. 422.504(l), (l)(1).

221.    UHG uses Semler's PPG products notwithstanding the unreliability of Semler's PPG's products with respect to diagnosing PAD.

222.    UHG has actual knowledge, is deliberately ignorant, or is acting in reckless disregard of the unreliability of Semler's PPG's products with respect to diagnosing PAD.

223.    UHG receives a substantially increased capitation payment from Medicare for each beneficiary for whom it submits a PAD diagnostic code.

224.    On information and belief, Medicare Advantage Defendants John Does 1-50 are engaged in the same scheme as UHG.

225.    As described above, Semler contracts with at least three additional MAOs for the purchase of FloChec and/or QuantaFlo.

## VII.    DEFENDANTS KNOWINGLY CAUSED THE SUBMISSION OF FALSE CLAIMS FOR REIMBURSEMENT TO THE GOVERNMENT, WHICH RESULTED IN SUBSTANTIAL HARM TO THE GOVERNMENT.

### A.    The Manufacturer Defendants Caused the Submission of Claims Barred by NCD 20.14

226.    Medicare does not reimburse claims for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," including for services that are determined to not be "reasonable and necessary" through a NCD. 42 U.S.C. § 1395y; 42 C.F.R. § 405.1060(a)(1)-(4).

227.    NCD 20.14 expressly determined that services involving PPG are not reimbursable by Medicare.

228.    PADnet, FloChec, and QuantaFlo involve PPG within the meaning of NCD 20.14.

229.    The Manufacturer Defendants falsely represented to medical providers that the use of PADnet, FloChec, and QuantaFlo was reimbursable by Medicare.

230.    As a result, medical providers and insurance carriers submitted claims arising from the use of PPG products to Medicare for reimbursement.

231.    The Manufacturer Defendants knew that medical providers and insurance carriers would bill Medicare for use of PADnet, FloChec, and QuantaFlo.

232.    As a result of the submission or claims for reimbursement by medical providers and insurance carriers for use of PADnet, FloChec, and QuantaFlo, Medicare has reimbursed medical providers and insurance carriers for claims that are not covered by Medicare.

233.    Throughout the relevant time period described in this Complaint, the Manufacturer Defendants caused medical providers and insurance carriers to submit reimbursement claims to Medicare for use of PPG products, and as a result, Medicare paid for these claims notwithstanding NCD 20.14's express prohibition.

**B.    The Manufacturer Defendants Caused the Submission of Claims Using Inapplicable CPT Codes**

234.    The Manufacturer Defendants falsely represented to medical providers that the use of PADnet, FloChec, and QuantaFlo satisfied CPT codes 93922, 93923, and 93924.

235.    Use of PADnet, FloChec, and QuantaFlo does not satisfy CPT codes 93922, 93923, and 93924.

236.    As a result, medical providers and insurance carriers submitted claims arising from the use of PADnet, FloChec, and QuantaFlo to Medicare for reimbursement using inapplicable CPT codes.

237.    Physicians submit claims for services on CMS Form 1500 or the electronic equivalent, which sets forth both the code describing the patient's diagnosis and the procedure codes utilized during the patient's stay.  **Exhibit 9**.

238.    On CMS Form 1500, the physician certifies that the care provided was "medically indicated and necessary to the health of the patient...." and that the provided information is "true, accurate and complete." Id. at 2.

239.    The Manufacturer Defendants' false representations to medical providers and insurance carriers caused physicians to improperly certify CMS Form 1500, including by using inapplicable CPT codes.

240.    As a result of the submission or claims for reimbursement by medical providers and insurance carriers for use of PADnet, FloChec, and QuantaFlo using inapplicable CPT codes, Medicare has reimbursed medical providers and insurance carriers for claims.

241.    Throughout the relevant time period described in this Complaint, the Manufacturer Defendants caused medical providers and insurance carriers to submit claims for use of their PPG products under CPT codes 93922, 93923, and 93924, which are inapplicable to use of their PPG products, and consequently, Medicare paid for these claims notwithstanding the inapplicability of these codes.

**C.    The Manufacturer Defendants Caused the Submission of Claims for Medically Unnecessary Services**

242.    Medicare does not reimburse claims for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

243.    Similarly, any services which are incidental to medically unnecessary care are not reimbursable. See 42 C.F.R. § 405.207 ("[P]ayment is not made for medical and hospital services that are related to the use of a device that is not covered because CMS determines that the device is not 'reasonable' and 'necessary' . . . or because it is excluded from coverage for other reasons.").

244.    The Manufacturer Defendants falsely represented to medical providers and insurance carriers that PADnet, FloChec, and QuantaFlo were reliable diagnostic tools with respect to diagnosing whether an individual suffers from PAD.

245.    PADnet, FloChec, and QuantaFlo are extremely inaccurate with respect to diagnosing PAD.

246.    Through NCD 20.14, Medicare regards PPG as "experimental."

247.    Instead of paying of a product that is reliable with respect to diagnosing PAD, Medicare paid and continues to pay for use of Defendants' "experimental" and inaccurate products.

248.    As a result of the submission or claims for reimbursement by medical providers and insurance carriers for use of PADnet, FloChec, and QuantaFlo in connection with diagnosing PAD, Medicare has reimbursed medical providers for claims that were not reasonable or necessary.

249.    Throughout the relevant time period described in this Complaint, the Manufacturer Defendants caused medical providers and insurance carriers to submit reimbursement claims to Medicare for services using Defendants' PPG products, and a result, Medicare paid for these claims notwithstanding that these services were not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." See 42 U.S.C. 1395y(a)(1)(A).

**D.      Semler and UHG Presented or Caused the Presentment of False Claims in Connection with Medicare Advantage Plans**

250.    In submitting diagnostic codes to CMS to enable CMS to calculate the appropriate capitation payment, MAOs must certify the "accuracy, completeness, and truthfulness" of the information and that the information is "accurate, complete, and truthful." See 42 C.F.R. 422.504(l), (l)(1).

251.    UHG utilized PPG devices, including FloChec and QuantaFlo, for the purpose of screening individuals enrolled in Medicare Advantage plans for PAD.

252.    UHG submitted diagnostic codes to CMS for PAD diagnoses based on the results provided by FloChec and QuantaFlo, irrespective of UHG's knowledge, deliberate indifference, or reckless disregard as to the inaccuracy of FloChec and QuantaFlo with respect to diagnosing PAD.

253.    Semler specifically targeted MAOs, including UHG, since MAOs would receive substantially increased capitation payments for individuals with PAD.

254.    Semler encouraged MAOs, including UHG, to utilize FloChec and QuantaFlo for purposes of screening individuals enrolled in Medicare Advantage plans for PAD notwithstanding its knowledge, deliberate indifference, or reckless disregard as to the inaccuracy of FloChec and QuantaFlo, with respect to diagnosing PAD.

255.    Throughout the relevant time period described in this Complaint, Semler and UHG presented or caused to be presented purported diagnoses of PAD supplied by FloChec and/or QuantaFlo for CMS's use in calculation capitation payment for Medicare Advantage beneficiaries, resulting in higher capitation payments by CMS.

## VIII.  COUNTS

### COUNT I
### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A) by BioMedix

256.    Relators repeat and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

257.    In violation of 31 U.S.C. §3729(a)(1)(A), BioMedix knowingly caused the submission of false or fraudulent claims for payment or approval to (1) officials of the United

States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

258.    The false statements made by BioMedix had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

259.    BioMedix made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

260.    By virtue of the false or fraudulent claims that BioMedix caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT II
### False Claims Act – Violation of 31 U.S.C. §3729(a)(1)(B) by BioMedix

261.    Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

262.    In violation of 31 U.S.C. §3729(a)(1)(B), BioMedix knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

263.    The false records and statements made by BioMedix had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

264.    By virtue of the false records and statements made by BioMedix, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III
## Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A) by Semler

265.    Relators repeat and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

266.    In violation of 31 U.S.C. §3729(a)(1)(A), Semler knowingly caused the submission of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

267.    The false statements made by Semler had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

268.    Semler made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

269.    By virtue of the false or fraudulent claims that Semler caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT IV
## False Claims Act – Violation of 31 U.S.C. §3729(a)(1)(B) by Semler

270.    Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

271.    In violation of 31 U.S.C. §3729(a)(1)(B), Semler knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to  (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

272.    The false records and statements made by Semler had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

273.    By virtue of the false records and statements made by Semler the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT V**
**Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A) by Bard**

274.    Relators repeat and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

275.    In violation of 31 U.S.C. §3729(a)(1)(A), Bard knowingly caused the submission of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

276.    The false statements made by Bard had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

277.    Bard made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

278.    By virtue of the false or fraudulent claims that Bard caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VI
### False Claims Act – Violation of 31 U.S.C. §3729(a)(1)(B) by Bard

279.    Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

280.    In violation of 31 U.S.C. §3729(a)(1)(B), Bard knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

281.    The false records and statements made by Bard had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

282.    By virtue of the false records and statements made by Bard, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VII
### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A) by UHG

283.    Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

284.    In violation of 31 U.S.C. §3729(a)(1)(A), UHG knowingly presented or caused the submission of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

285.    The false statements made by UHG had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

286.    UHG made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements

287.    By virtue of the false or fraudulent claims that UHG presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim

## COUNT VIII
### False Claims Act – Violation of 31 U.S.C. §3729(a)(1)(B) by UHG

288.    Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

289.    In violation of 31 U.S.C. §3729(a)(1)(B), UHG knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

290.    The false records and statements made by UHG had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

291.    By virtue of the false records and statements made by UHG, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## REQUEST FOR RELIEF

WHEREFORE, Relators, on behalf of the United States, demand that judgment be entered in their favor and against Defendants for:

(1)    Three times the amount of damages to the government;

(2)    Civil penalties of (1) no more than $11,000 and no less than $5,500 for each violation of the FCA that occurred after September 29, 1999 but before November 2, 2015 and (2) no more than $21,563 and no less than $10,781 for each violation of the FCA that occurred on or after November 2, 2015;

(3)    Any other recoveries or relief provided for under the FCA;

(4)    Relators' receipt of the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs, based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action; and

(5)    Such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), a jury trial is demanded in this case.

Dated: December 7, 2016                    Respectfully submitted,

                                           **BERGER & MONTAGUE, P.C.**

                                           Jonathan Z. DeSantis (FBN 112446)
                                           Daniel R. Miller (*pro hac vice* forthcoming)
                                           1622 Locust Street
                                           Philadelphia, PA 19103
                                           Tel: (215) 875-3000
                                           Fax: (215) 875-4604
                                           jdesantis@bm.net
                                           dmiller@bm.net

                                           *Counsel for Relators*