**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA *ex rel.*
ROBERT KANE, FRANKLIN W. WEST,
and INTREPID5, LLC,

      Plaintiffs,

v.

UNITEDHEALTH GROUP, INC., *et al.*,

      Defendants.

_____

No. 3:16-cv-1516-HES-MCR

**DEFENDANTS' MOTION TO DISMISS**
**RELATORS' SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

BACKGROUND ................................................................................................3

    A.   Medicare Advantage.................................................................................3
    B.   Peripheral Arterial Disease ......................................................................4
    C.   FDA Clearance of QuantaFlo for Use in PAD Diagnosis and United's Subsequent Use of the Device ....................................................5

LEGAL STANDARD .........................................................................................7

ARGUMENT .....................................................................................................7

I.    THE COMPLAINT'S CORE FCA CLAIMS FAIL RULE 9(B) (COUNTS I AND II) ..............................................................................8

    A.   The Complaint Does Not Plead with Particularity the Submission of a Single False Claim.......................................................8
    B.   The Complaint Fails to Plead an Objectively False Claim ..................19
    C.   The Complaint Fails to Plausibly Plead Knowledge ...........................23

II.   THE COMPLAINT'S OTHER CLAIMS FAIL (COUNTS III AND IV).............................................................................................26

    A.   The Complaint's Reverse False Claims Count Fails ...........................26
    B.   The Complaint Fails to Plead a Conspiracy Count with Particularity...........................................................................................28

III.  THE QUI TAM PROVISION IS UNCONSTITUTIONAL........................29

CONCLUSION ................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................. 7, 23

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ....................................................................................28

*Bell v. Cross,*
  2021 WL 5544685 (11th Cir. Nov. 26, 2021) ...........................................22

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .........................................................................................29

*Carrel v. AIDS Healthcare Found., Inc.,*
  898 F.3d 1267 (11th Cir. 2018) ............................................................ *passim*

*Chapman v. Abbott Lab'ys,*
  930 F. Supp. 2d 1321 (M.D. Fla. 2013) ......................................................5

*Corsello v. Lincare, Inc.,*
  428 F.3d 1008 (11th Cir. 2005) .......................................................8, 12, 13, 15

*ECB USA, Inc. v. Savencia Cheese USA, LLC,*
  148 F.4th 1332 (11th Cir. 2025) ...................................................................7

*Gose v. Native Am. Servs. Corp.,*
  109 F.4th 1297 (11th Cir. 2024) .................................................................28

*Graves v. Plaza Med. Ctrs., Corp.,*
  276 F. Supp. 3d 1335 (S.D. Fla. 2017) ......................................................27

*Hopper v. Solvay Pharms., Inc.,*
  588 F.3d 1318 (11th Cir. 2009) ..................................................................17

*In re Prime Choice Home Health, Inc.,*
  2012 WL 9189864 (H.H.S. Oct. 26, 2012) ..............................................5, 26

*Olhausen v. Arriva Med., LLC,*
  124 F.4th 851 (11th Cir. 2024) ..................................................................14

*Otto Candies, LLC v. Citigroup Inc.*,
 137 F.4th 1158 (11th Cir. 2025) ..................................................................23

*Seila Law LLC v. CFPB*,
 591 U.S. 197 (2020) ..................................................................29

*U.S. ex rel. Atkins v. McInteer*,
 470 F.3d 1350 (11th Cir. 2006)..................................................*passim*

*U.S. ex rel. Clausen v. Lab'y Corp. of Am.*,
 290 F.3d 1301 (11th Cir. 2002)..................................................*passim*

*U.S. ex rel. Gonite v. UnitedHealthcare of Georgia, Inc.*,
 785 F. Supp. 3d 1325 (M.D. Ga. 2025) ...........................................10

*U.S. ex rel. Keeler v. Eisai, Inc.*,
 568 F. App'x 783 (11th Cir. 2014)..................................................13

*U.S. ex rel. Sanchez v. Lymphatx, Inc.*,
 596 F.3d 1300 (11th Cir. 2010)..................................................16

*U.S. ex rel. Schutte v. SuperValu Inc.*,
 598 U.S. 739 (2023) ..................................................................23

*U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*,
 751 F. Supp. 3d 1293 (M.D. Fla. 2024) ...................................... 28, 29

*U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*,
 No. 24-13581 (11th Cir.) ..................................................................29

*U.S. v. AseraCare, Inc.*,
 938 F.3d 1278 (11th Cir. 2019)..................................................19, 20, 22

*U.S. v. Comfort Care Hospice, L.L.C.*,
 No. 2:20-CV-911, 2026 WL 473999 (M.D. Ala. Feb. 19, 2026) .........................27

*U.S. v. Space Coast Med. Assocs., L.L.P.*,
 94 F. Supp. 3d 1250 (M.D. Fla. 2015)...........................................18

*United States ex rel. Foreman v. AECOM*,
 19 F.4th 85 (2d Cir. 2021)..................................................................27

*Vargas v. Lincare, Inc.*,
 134 F.4th 1150 (11th Cir. 2025) ..................................................*passim*

## STATUTES

31 U.S.C.
　　§ 3729(a)(1)(A) ................................................................................ 7, 27
　　§ 3729(a)(1)(C) ................................................................................28
　　§ 3729(a)(1)(G) ................................................................................26
　　§ 3729(b)(1) ....................................................................................23
　　§ 3730(b)(1) ....................................................................................28

42 U.S.C.
　　§ 1320a-7k(d)(2)................................................................................26
　　§ 1395y(l)(6) ....................................................................................4

## RULES

Fed. R. Civ. P. 9(b)...........................................................................*passim*

Fed. R. Civ. P. 12(b)(6).........................................................................1

## REGULATIONS

42 C.F.R. § 422.101 .............................................................................25

## OTHER AUTHORITIES

Nat'l Insts. of Health, *What Is Peripheral Artery Disease*, https://www.nhlbi.nih.gov/health/health-topics/topics/pad (last updated Mar. 24, 2022)..................................................................4

https://www.accessdata.fda.gov/cdrh_docs/pdf14/K143094.pdf..........................5

https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ ncd103c1_part1.pdf.......................5

https://www.semlerscientific.com/quantaflo .....................................................7

Identify, *New Oxford American Dictionary* (3d ed. 2010) ...........................................27

www.semlerscientific.com/quantaflo..................................................................21

Defendants UnitedHealth Group, Inc. and related entities (United) move to dismiss Relators' Second Amended Complaint, ECF 109 (SAC), under Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## INTRODUCTION

In this eighty-two-page complaint—the second attempt to save a case that DOJ declined after investigating for four years—Relators still have not identified "the sine qua non of a False Claims Act violation": a false claim actually submitted to the government. *See U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). The thrust of Relators' complaint is that QuantaFlo, a medical device that FDA cleared for use in the diagnosis of Peripheral Arterial Disease (PAD), is in fact not reliable for that purpose. Because United used QuantaFlo to assist in the diagnosing of PAD, Relators claim that United submitted false PAD diagnoses to the government. But despite claims of "staggering" fraud, Relators fail to identify a *single* false diagnosis that was actually submitted. The complaint refers to no specific request for payment, no specific transaction, and no specific reimbursement—in short, no specific claim. That failure alone requires dismissal under Rules 9(b) and 12(b)(6).

Relators' new eighty-two-page pleading is longer but not better. It adds images, documents, and alleged accounts of "witness" interviews but does nothing to answer the question whether United submitted a single PAD diagnosis that was actually false. In fact, much of the SAC's new material consists of undisputed and irrelevant facts—for example, how Medicare Advantage (MA) works, what a QuantaFlo report looks like, and whether United tracks PAD diagnoses. Other new allegations allude to

1

statistical patterns, payment processes, and patient details. And while the SAC identifies four positive QuantaFlo test results, there is no allegation that any diagnoses resulting from these tests were ultimately submitted to CMS. In short, all these new allegations have not fixed the central legal flaw of the previous two complaints: the inability to identify a single false claim actually submitted to the government.

Even more problematic, Relators fall far short of alleging the key element that makes fraud, *fraud*: that United acted knowingly. Relators plead no facts plausibly suggesting that United believed either that QuantaFlo was unreliable or that its providers' PAD diagnoses were inaccurate. Relators cite complaints from two clinicians (among tens of thousands of United providers) who expressed some doubt about the reliability of QuantaFlo, but they say nothing about how United evaluated those complaints, whether it agreed with their assessment of QuantaFlo's reliability, or if United otherwise thought that patients diagnosed with the aid of QuantaFlo did not actually have PAD. On the contrary, Relators' earlier complaint acknowledged that United responded to providers' questions by commissioning two clinical studies that ended up supporting QuantaFlo's accuracy—an admission sufficiently damning that Relators saw fit to remove it from this pleading.

Relators' theory of liability will also require them to disprove FDA's scientific judgment that QuantaFlo could be used to assist in diagnosing PAD. That demonstrates a third central problem with the complaint: The FCA punishes claims and statements that are objectively false, not mere disputes between experts on matters of clinical judgment and scientific opinion. And even if a jury ultimately disagrees with

2

FDA's determination and clinicians' PAD diagnoses, a regulator's expertise and clinicians' diagnostic judgment cannot constitute *fraud*. For all these reasons, Relators' derivative FCA claims must also be dismissed.

The deficiencies here are precisely those that the Eleventh Circuit has flagged time and again: the FCA is designed for relators with "hands-on access" to specific false claims and "firsthand knowledge" demonstrating scienter. *Vargas v. Lincare, Inc.*, 134 F.4th 1150, 1158-59 (11th Cir. 2025). But despite three attempts over this decade-long case, Relators still cannot point to a single false claim submitted to the government. Because Relators have now amended twice, once *after* seeing United's prior Motion to Dismiss, ECF 95, the SAC should be dismissed with prejudice.

## BACKGROUND

### A.    Medicare Advantage

United provides health coverage to millions of Americans via the MA program. SAC ¶ 3. MA, or Medicare Part C, is an alternative to traditional Medicare where healthcare benefits are provided via private insurers, instead of through direct coverage by the Centers for Medicare and Medicaid Services (CMS). *Id.* ¶ 1. Under MA, plans offer coverage to beneficiaries and in return receive a per-enrollee payment from CMS, calculated based on each enrollee's health status. *Id.* ¶¶ 2, 42-45.

To compute the appropriate payment, CMS calculates a "risk adjustment factor" for each enrollee based on that person's medical conditions, as represented by "medical diagnosis codes" submitted by the plan. SAC ¶¶ 44-49. As a result, plans receive greater payments for enrollees with a greater number of health conditions to

3

reflect the increased risk of providing medical coverage. *Id.* ¶¶ 2, 47-48. Under MA, and unlike other forms of Medicare, CMS *only* pays per-enrollee payments, and it does not reimburse plans for the procedures or devices they use to diagnose beneficiaries.

### B.     Peripheral Arterial Disease

Until recently, one such "risk adjustment factor" was a diagnosis of PAD. SAC ¶ 273. PAD is a serious condition that can "restrict[] or entirely block[] blood flow through the body," and it can require amputations if not properly diagnosed and treated. *Id.* ¶¶ 3, 61, 64. Although PAD affects "more than 8 million people ages 40 and older," many individuals with PAD experience "no symptoms at all." Nat'l Insts. of Health, *What Is Peripheral Artery Disease*, https://www.nhlbi.nih.gov/health/health-topics/topics/pad (last updated Mar. 24, 2022). As a result, "[e]arly diagnosis" is important to "reduce [the] risk [of] serious complications." *Id.* There are a "variety" of methods used for PAD diagnosis, SAC ¶ 3, and one common method is plethysmography, or the "measurement and recording" of "changes in the size of a body part" based on "circulation of blood in that part," *id.* ¶ 66.

In 1980, CMS released a National Coverage Determination—a determination about whether CMS will reimburse healthcare providers for "a particular item or service," 42 U.S.C. § 1395y(l)(6); *see also* SAC ¶¶ 55, 100—that concluded CMS would not reimburse providers for using photoelectric plethysmography (PPG) in diagnosing PAD because it was "[e]xperimental" and "d[id] not provide reproducible measurements of blood flow." CMS, *Medicare National Coverage Determinations Manual*

§ 20.14 ("1980 NCD").[1] The NCD does not prohibit providers or plans from using these devices for diagnosis; it limits them only from billing for their use. And the U.S. Department of Health and Human Services has made clear that an "NCD is neither a practice parameter nor a statement of the accepted standards of medical practice." *In re Prime Choice Home Health, Inc.*, 2012 WL 9189864, at *16 (H.H.S. Oct. 26, 2012).

### C.     FDA Clearance of QuantaFlo for Use in PAD Diagnosis and United's Subsequent Use of the Device

In 2015, FDA cleared Semler Scientific, a medical device manufacturer, to market a device named QuantaFlo for use "in the diagnosis and monitoring of Peripheral Arterial Disease." FDA, *K143094* (Mar. 5, 2015) ("FDA K143094");[2] *see* SAC ¶¶ 70-74, 110.[3] The FDA label explained that QuantaFlo "us[es] volume plethysmography," one type of plethysmography. FDA K143094.

Relators allege that in 2016, the year after FDA cleared QuantaFlo for use "in the diagnosis . . . of Peripheral Arterial Disease," *id.*, United began deploying QuantaFlo to screen its beneficiaries for PAD and encouraged its providers to do so as well. SAC ¶¶ 130, 135. Notwithstanding FDA's clearance of QuantaFlo for use in diagnosing PAD, Relators allege that QuantaFlo is in fact unreliable, *id.* ¶ 4, and that PAD diagnoses submitted to CMS by United for risk adjustment purposes were allegedly based on QuantaFlo and thus always (or nearly always) wrong, *id.* ¶¶ 4, 6.

---

[1] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ncd103c1_part1.pdf
[2] https://www.accessdata.fda.gov/cdrh_docs/pdf14/K143094.pdf
[3] Relators cite the FDA label. *See* SAC ¶ 110. In any event, courts may take judicial notice of an FDA label. *See Chapman v. Abbott Lab'ys*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013).

As a result, United allegedly received higher CMS payments based on PAD conditions that beneficiaries allegedly did not have. Relators do not allege that United sought reimbursement for the costs of administering QuantaFlo tests or that it violated the 1980 NCD.

Specifically, Relators allege that United engaged in two schemes related to the use of QuantaFlo. First, Relators allege that United "used QuantaFlo to diagnose PAD through its internal 'HouseCalls' program," which provides "in-home . . . health assessments to Medicare Advantage members" (the "HouseCalls Scheme"). SAC ¶¶ 137-38. Second, Relators allege that United "pressure[d] providers to use QuantaFlo to diagnose PAD" (the "Partner Providers Scheme"). *Id.* ¶¶ 157-59.

In September 2025, the United States intervened in this case to settle with Semler. ECF 66. The settlement agreement with Semler focuses on and solely resolves claims that Semler "knowingly caus[ed]" the "submission of false claims to Medicare Part B"—the Medicare program which reimburses doctors for office visits and procedures (as opposed to Part C, Medicare Advantage, at issue here). SAC ¶¶ 110, 128. Specifically, the agreement's recitations allege Semler falsely "continued to market the Devices as reimbursable" despite the terms of the 1980 NCD. *Id.* Semler expressly denied liability. ECF 66-2, Ex. B ¶ F. The agreement does not allege that any PAD diagnoses resulting from use of the devices were false or that Semler caused MA plans to submit false claims to CMS under Part C of Medicare. Nor did the government revoke QuantaFlo's clearance or require Semler to withdraw QuantaFlo from the market. Indeed, Semler continues to this day to market QuantaFlo, consistent

with its FDA cleared label, for use in diagnosing PAD.[4] *See* SAC ¶ 110.

Although DOJ "investigated Relators' allegations" for "many years," SAC ¶ 108, it declined to intervene against United, ECF 66. Relators then filed a First Amended Complaint, ECF 87 (FAC), and United moved to dismiss, ECF 95. In lieu of defending their FAC, Relators filed this Second Amended Complaint.

## LEGAL STANDARD

A court accepts a complaint's factual allegations as true—but only if the complaint states "a plausible claim for relief." *ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332, 1346-47 (11th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). Labels and conclusions do not suffice. *Id.* Moreover, because an FCA claim sounds in fraud, Rule 9(b) applies. *Vargas*, 134 F.4th at 1157. The complaint thus must "spell out the fraud in detail—what happened, who did it, when and where it occurred, and how it amounted to fraud." *Id.*

## ARGUMENT

To state an FCA claim, a relator must plead that the defendant "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" to the government, 31 U.S.C. § 3729(a)(1)(A), or "knowingly ma[de] . . . a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). The complaint fails every element: it fails to identify any specific "false or fraudulent claim" submitted to the government, and it pleads neither legally cognizable "fals[ity]"

---

[4] See https://www.semlerscientific.com/quantaflo (describing the uses of QuantaFlo marketed by Semler).

nor plausible "know[ledge]." And because the "reverse false claims" and conspiracy theories are derivative of the underlying FCA claim, they too must be dismissed.

## I. THE COMPLAINT'S CORE FCA CLAIMS FAIL RULE 9(B) (COUNTS I AND II)

### A. The Complaint Does Not Plead with Particularity the Submission of a Single False Claim

The complaint alleges United violated the FCA by using "unreliable products"—i.e., QuantaFlo—"to falsely diagnose its beneficiaries" with PAD. SAC ¶ 3. But nowhere in the lengthy complaint do Relators plead with particularity "if—or when—any actual improper claims were submitted to the Government." *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1312 (11th Cir. 2002). That omission is fatal. To satisfy Rule 9(b), the Eleventh Circuit requires the "who, what, where, when, and how" of a specific claim, not merely a theory of wrongdoing. *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)).

Since the seminal *Clausen* decision, which held that Rule 9(b) applies to FCA complaints, 290 F.3d at 1309-10, the Eleventh Circuit has repeatedly reaffirmed that to survive dismissal "a relator must allege not just a scheme, but a scheme that *actually led to false claims being submitted to the government*—and he must do so with particularity." *Vargas*, 134 F.4th at 1157 (emphasis added). "The FCA targets false claims—not regulatory violations, not internal misconduct, and not abstract theories untethered from government payment." *Id.* Rule 9(b)'s particularity requirement "ensures that the relator's strong financial incentive to bring an FCA claim . . . does not precipitate the

8

filing of frivolous suits" that "harm a defendant's goodwill and reputation . . . to extract settlements." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359-60 (11th Cir. 2006) (internal quotations omitted). Importantly, it also serves the purpose of keeping FCA suits from becoming fishing expeditions. *Id.*

Relators most directly satisfy Rule 9(b) if they "identify[] specific claims" that were actually submitted, including "invoices, billing records, [and] reimbursement forms." *Vargas*, 134 F.4th at 1157. Otherwise, a relator who is neither an insider with "first-hand knowledge of the defendants' billing practices," *id.*, nor who personally "participat[ed] in the fraudulent conduct," *Carrel*, 898 F.3d at 1276, must instead "plead[] the submission of a claim" with "'indicia of reliability'" such as "'[a]llegations of date, time, or place,'" *Vargas*, 134 F.4th at 1157 (citations omitted). Even insiders with "direct knowledge of [a] defendant['s] billing and patient records,' []still must allege 'specific details' about false claims to establish the 'indicia of reliability necessary under Rule 9(b).'" *Carrel*, 898 F.3d at 1276 (citation omitted). United is not aware of the Eleventh Circuit ever finding, post-*Clausen*, that corporate outsiders—like Relators here—had satisfied Rule 9(b) absent details about particular false claims.

Here, to satisfy Rule 9(b) as to falsity, Relators must allege "highly reliable" facts showing that a particular diagnosis was made with the use of a Semler device,[5]

---

[5] Although the complaint contains scattered mentions of FloChec, a predecessor of QuantaFlo, the only particularized allegation tying FloChec to United is that United leased FloChec devices since "at least 2014." SAC ¶ 128. All detailed allegations relating to United's actual *use* of Semler devices in its HouseCalls program or with providers solely involve QuantaFlo. *See, e.g., id.* ¶¶ 137 ("UHG used QuantaFlo to diagnose PAD through its internal 'HouseCalls' program."), 162 ("UHG financially incentivized partner providers to use QuantaFlo . . . ."). This is no coincidence, as all these programs

that it was incorrect, and that the diagnosis was ultimately submitted to CMS. Because, as Relators admit, United is "compensated by the federal government on a capitation basis" based on enrollees' "health status," SAC ¶¶ 42, 44, and not for the costs of devices or procedures used to render a diagnosis, an accurate PAD diagnosis is an appropriate claim for payment—whether or not influenced by a Semler device.[6]

### 1.    The HouseCalls Allegations Never Identify a Claim

Relators plead no particularized facts of any kind about the HouseCalls Scheme. They do not identify any "specific claim[]" that was actually submitted—nor even a specific patient, test, or diagnosis. *Vargas*, 134 F.4th at 1157. And they offer no other "first-hand knowledge" or "documentary proof" that would lend their claims an indicia of reliability. *Id.* The SAC explains how a hypothetical incorrect diagnosis *might* have been generated in the HouseCalls program, *see* SAC ¶¶ 137-56, but that is precisely the attempt to plead "just a scheme" that the Eleventh Circuit has repeatedly rejected, *see Vargas*, 134 F.4th at 1157. Dismissal of the HouseCalls Scheme is required.

### 2.    The Partner Provider Allegations Also Fail

The Partner Providers Scheme fares no better. The SAC identifies no specific claim, no invoice, and no payment. Instead, it offers three stand-ins to attempt to

---

used QuantaFlo, not FloChec. Regardless, United's arguments do not depend on which Semler device forms the basis for Relators' allegations.

[6] Relators are wrong that "enrollment constitutes presentment" under *U.S. ex rel. Gonite v. UnitedHealthcare of Georgia, Inc.*, 785 F. Supp. 3d 1325, 1338 (M.D. Ga. 2025). *Gonite* involved allegations that certain individuals were not "validly enrolled" in Medicare Advantage, and because "each enrollment triggers an automatic capitated payment . . . [,] enrollment constitute[d] presentment." *Id.* at 1338. This case concerns diagnoses for existing enrollees—where diagnoses affect the amount of risk-adjusted payments, not any allegation of improper beneficiary enrollment.

satisfy Rule 9(b): first, details about three *patients*—though notably not details about any *claims*, SAC ¶¶ 248, 282-90; second, details of the *process* for submitting claims—though notably nothing about the claims themselves, *see id.* ¶¶ 151-54, 165-170, 177, 229-235; and third, statistical probabilities—though notably not specific examples, *see id.* ¶ 280. Under blackletter Eleventh Circuit law, all three avenues fail.

### a.    The Three Positive QuantaFlo Tests Are Not Claims

Relators amended their previous complaint to add three positive QuantaFlo test results for patients of Dr. Susan Baumgaertel, a former physician at a United-affiliated clinic who is not herself a relator. *See* SAC ¶¶ 236-37, 248. Relators stop short of alleging that any resulting PAD diagnoses based on these tests were false—i.e., that these patients did not in fact have PAD. Relators assert only that Dr. Baumgaertel "did not believe" these patients "actually suffered from PAD," *id.* ¶ 249, because they had "no indications of PAD," *id.* ¶ 255. But the SAC admits that Dr. Baumgaertel herself did not rely on the absence of clinical indications to rule out PAD. Instead, "when Dr. Baumgaertel doubted a positive QuantaFlo result, she referred the patient to schedule follow-up testing" to determine whether they in fact had PAD. *Id.* ¶ 259. And then the SAC goes silent. It does not provide any information about the results of that follow-up testing on those three patients—so for all the complaint alleges, in all three cases the follow-up testing may have *confirmed* these three PAD diagnoses.[7] If so, any

---

[7] If these three patients did not undergo confirmatory testing, then *at best* for Relators (since the complaint admits that these three patients had positive QuantaFlo results), the complaint leaves us to guess as to whether any PAD diagnoses resulting from these three tests were false.

resulting submission of those diagnoses to CMS would not have been false.

Even if these patients did not have PAD, the Eleventh Circuit has held—at least four times—that allegations of misdiagnosed *patients* do not satisfy Rule 9(b)'s requirement for particularized allegations about "a specific fraudulent *claim [that] was in fact submitted*." *Carrel*, 898 F.3d at 1275 (emphasis added). In *Atkins*, the relator was a practicing psychiatrist who "cite[d] particular patients, dates and corresponding medical records for services that he contend[ed] were not eligible for government reimbursement." 470 F.3d at 1359. But the court distinguished allegations identifying "patients, dates, and . . . medical records" from "the next link in the FCA liability chain: showing that the defendants actually submitted reimbursement claims for the services [the relator] describes." *Id.* Because Atkins was "a psychiatrist responsible for the provision of medical care, not a billing and coding administrator responsible for filing and submitting the defendants' claims for reimbursement"—and thus lacked any "firsthand knowledge of the defendants' submission of false claims"—he could not satisfy the "next link" under Rule 9(b): allegations of specific claims. *Id.* at 1359.

The Eleventh Circuit has repeatedly reinforced that rule. In *Clausen*, the "complaint went into such details as to identify specific long-term care facilities, patients, dates of testing, and testing procedures," *Atkins,* 470 F.3d at 1359 (describing facts of *Clausen*), but the Eleventh Circuit distinguished those particularized allegations about *medical procedures* from particularized allegations about *false claims*: "No amounts of charges were identified. No actual dates were alleged . . . . No copy of a single bill or payment was provided." *Clausen*, 290 F.3d at 1312. Similarly, in *Corsello v. Lincare,*

12

*Inc.*, 428 F.3d 1008 (11th Cir. 2005), the relator, a former sales employee of the defendants, was able to "provide[] the initials" of specific "patients whose Medicare forms were improperly completed," but the Eleventh Circuit held that too was insufficient because Corsello was not "an employee in the billing department," and while he pled the details of "improper practices," he "failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how'" of specific claims "submi[tted] to the government." *Id.* at 1013-14. And in *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783 (11th Cir. 2014), the Eleventh Circuit rejected a drug salesman's assertion that pharmaceutical claims were improperly submitted because the "belief that false claims were actually submitted apparently rest[ed] on" the assumption that providers "naturally must have sought reimbursement." *Id.* at 802. But the relator "was only a salesman and had no personal knowledge of what providers did after they were incentivized to prescribe [the defendant's] drugs," so dismissal was appropriate because demonstrating actual submission was "the crux of any FCA claim." *Id.*

This complaint matches those rejected in *Atkins*, *Clausen*, *Corsello*, and *Eisai*. Dr. Baumgaertel (herself not a relator) is even more distant than the psychiatrist relator in *Atkins*: as a frontline medical provider who did not work in coding and billing, she could not have known whether any diagnoses made their way through United's coding, billing, and quality control processes and were ultimately submitted to CMS. Unsurprisingly, the complaint reflects that lack of "firsthand knowledge" about billing and submission: while it provides specificity about the three patients' tests, it simply asserts that the diagnoses "were fed into the Optum machine for risk adjustment," *id.*

13

¶ 258, and that there was a "systematic submission of false diagnoses to CMS for payment," *id.* ¶ 281. And while the complaint is replete with boilerplate assertions that PAD diagnoses "w[ere] submitted by the billing and coding office," *id.* ¶ 250; *see also id.* ¶ 281, it lacks any nonconclusory assertion that *these* QuantaFlo tests (or *any* particular tests, for that matter) resulted in false diagnoses that were submitted to CMS.[8]

The Eleventh Circuit has rejected this type of pleading "over and over," because "'the inference that fraudulent claims were submitted . . . [can]not [be] inferred.'" *Olhausen v. Arriva Med., LLC*, 124 F.4th 851, 860-61 (11th Cir. 2024) (quoting *Carrel*, 898 F.3d at 1275). Details about "patient lists" and "lab results" can "set the stage for the consummation of [an] alleged nefarious plot to recover unjustified amounts of taxpayer money," but they do not constitute sufficient particularized allegations that "the schemes were brought to fruition." *Clausen*, 290 F.3d at 1312. Relators may not "summarily conclude[] that the defendants submitted false claims" without providing detail "support[ing] the allegation." *Atkins*, 470 F.3d at 1357-59.

> **b.    Describing the Billing Process Does Not Show that Claims Were Submitted**

Under Eleventh Circuit caselaw, Relators also cannot satisfy Rule 9(b) merely by describing the claims-submission process. In *Carrel*, "the relator [wa]s an insider who allege[d] awareness of general billing practices"—even "'improper practices'"—

---

[8] Relators also allege that a nurse practitioner diagnosed a United patient, Dr. Amy Chappell, with PAD. *See* SAC ¶¶ 282-90. But those allegations are even more threadbare than those about Dr. Baumgaertel's patients and do not assert that Dr. Chappell's PAD diagnosis was submitted to CMS.

14

from employment in "managerial positions" and "attendance at 'monthly financial review meetings'" with executives. 898 F.3d at 1275-77. But "relators failed to explain how their access to possibly relevant information translated to knowledge of actual tainted claims presented to the government." *Id.* at 1278.

The SAC offers nothing more than an "awareness of general billing practices." *Carrel*, 898 F.3d at 1276. As the complaint itself puts it, Relators "identify with particularity *the mechanism* of false statements." SAC ¶ 235 (emphasis added). But "describ[ing] in detail . . . [a] *scheme* for defrauding the government by submitting false claims" is insufficient, *Atkins*, 470 F.3d at 1359 (emphasis added), because a mechanism for claims submission cannot satisfy the basic Rule 9(b) requirement of "a specific fraudulent claim . . . submitted to the government," *Carrel*, 898 F.3d at 1275 (quoting *Corsello*, 428 F.3d at 1014).

Nor does the complaint provide an "indicia of reliability to support the assertion that the defendants submitted false claims." *Atkins*, 470 F.3d at 1358-59. Relators' allegations consist of generic descriptions of Medicare Advantage that would apply to any MA plan. *See* SAC ¶¶ 151-54 (alleging that United "memorialized" QuantaFlo test results, "then submitted the PAD diagnoses to CMS"); *id.* ¶¶ 165-70 (alleging that United subsidiaries "aggregat[ed]" and "'batched' the new PAD diagnoses" which were "then submitted" to CMS); *id.* ¶ 177 (alleging, without detail, that one step in the MA reimbursement process was "UHG submits PAD diagnosis to CMS"); *id.* ¶¶ 230-32 (alleging United "submitted the data to CMS"). No one disputes that United

15

"aggregat[es]" diagnoses from its customers and submits that data to CMS—that is how Congress set up Medicare Advantage. But providing a basic overview of the statutory scheme does not constitute particularized evidence of fraud by United.

The same defect applies to allegations about Dr. Shannon Decker, a former United employee who also is not a relator. The SAC asserts that Dr. Decker "oversaw the [] risk adjustment process," "participated in executive meetings which displayed the company architecture for the use of QuantaFlo," and "had direct visibility into the submission of PAD diagnoses generated by QuantaFlo to Optum and UHG," SAC ¶¶ 195, 197-98. But the SAC still does not identify a single false claim. *See id.* ¶¶ 204-21. Where a relator or witness "supposedly had access to pertinent data and still w[as] unable to pinpoint specific false claims," that omission in fact "suggests that they lack any meaningful 'personal knowledge'" of false claims. *Carrel*, 898 F.3d at 1278; *see also U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010) (affirming dismissal where, "[d]espite [the relator's] assertion that she had direct knowledge of the defendants' billing and patient records, however, [she] failed to provide any specific details" about the "dates," "frequency," or "amounts" of false claims).

### c.  Statistics Cannot Replace Actual Claims

Relators' invocation of generalized statistics and probabilities likewise does not demonstrate a false claim. Relators purport to have conducted their own study—with a sample size of only sixteen individuals, SAC ¶ 93—and found that QuantaFlo was unreliable. Generalizing from those sixteen individuals to United's "700,000 PAD diagnoses," *id.* ¶ 269, Relators then assert that "[m]ore Than 50% of the Diagnoses

16

UHG Submitted to CMS . . . Were Factually False." *Id.* at 65. Similarly, Relators assert that, because MA claims are "submitted to CMS on a monthly basis as a matter of law," *id.* ¶ 292, some PAD diagnoses must have translated into claims. But both statistical assertions constitute allegations that false claims "must have been submitted, were likely submitted or should have been submitted to the Government"—and which the Eleventh Circuit has repeatedly rejected. *Clausen*, 290 F.3d at 1311.

Under Rule 9(b), Relators may not "rely on mathematical probability to conclude that [defendants] surely must have submitted a false claim at some point," because "a relator must allege an '*actual false claim* for payment' that was presented to the government." *Carrel*, 898 F.3d at 1277 (emphasis in original; internal citation omitted). In *Vargas*, the relator alleged that defendants violated Medicare rules requiring verification of financial need by including in "every" shipment "a standardized [] waiver form . . . without any income verification." 134 F.4th at 1160. Despite the almost certain probability that this unlawful practice led to the submission of false claims, the Eleventh Circuit dismissed: the relators had "identif[ied] no patient whose co-pay was improperly waived and for whom reimbursement was sought." *Id.*; *see also id.* at 1161 ("[R]elators provide no claim numbers, no billing codes, no dates, and no reimbursement amounts to satisfy Rule 9(b)'s requirements."); *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1325-26 (11th Cir. 2009) ("[R]elators describe [] 'a highly-compelling statistical analysis [that] renders inescapable the conclusion that a huge number of claims . . . resulted from [Solvay's illegal marketing].' But, the Complaint does not allege the existence of a single actual false claim." (citation omitted)).

17

### d. A False Certification Theory Must Still Plead a Claim

Finally, Relators' false certification theory—that United wrongly certified the collective accuracy of the diagnoses, "[e]ven if a particular QuantaFlo-based PAD diagnosis happened to be accurate," SAC ¶ 300—does not authorize an end run around Rule 9(b). If the underlying diagnoses submitted by United were accurate, then the certification of accuracy was not false. That is why, in this District as elsewhere, "false certification[]" claims must still "be pleaded with particularity" by "plead[ing] false claims [that were] submitted to the government. *U.S. v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1258 (M.D. Fla. 2015). Because Relators have not alleged that any particular claim was incorrect, they cannot "rely on mathematical probability" to infer that the certification was inaccurate. *Carrel*, 898 F.3d at 1277.[9]

\* \* \*

Relators knew that even their SAC would fail to plead false claims with particularity. That is why, only days before filing the SAC, Relators argued that the claims data is "uniquely within the defendant's control" and discovery would be needed to "enable the plaintiff to obtain the information" to satisfy Rule 9(b). ECF 101 at 20-21. Yet while the Eleventh Circuit is "not unsympathetic" to the fact that "a corporate outsider" must "work" much harder than "an insider" in "meeting the pleading requirements" of Rule 9(b), "neither the Federal Rules nor the [False Claims] Act offer any special leniency" for outsiders. *Clausen*, 290 F.3d at 1314. And "[t]he

---

[9] Nor is QuantaFlo—a device cleared by FDA for use in diagnosing PAD—remotely akin to a "broken clock" that is accurate only twice a day (once every 720 minutes). *See* SAC ¶ 300.

18

particularity requirement of Rule 9[(b)] is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." *Atkins*, 470 F.3d at 1359. At bottom, even though Relators now claim to have discovered witnesses and documents, the complaint does not identify *a single false PAD diagnosis, based on a Semler device, that was submitted to CMS*. That failure alone requires dismissal.

### B.    The Complaint Fails to Plead an Objectively False Claim

Relators also fail to identify any claim that could be objectively false. A "clinical judgment" cannot be "'false'—and thus cannot trigger FCA liability—if the underlying clinical judgment does not reflect an objective falsehood." *U.S. v. AseraCare, Inc.*, 938 F.3d 1278, 1296-97 (11th Cir. 2019). A "mere difference of reasonable opinion" between two experts is insufficient to show a falsehood, because the FCA demands "a flaw that can be demonstrated through verifiable facts." *Id.* at 1297.

This complaint represents a classic case for dismissal under *AseraCare*. Relators' essential allegation is that United submitted incorrect PAD diagnoses, but a diagnosis is a canonical "clinical judgment"—subject to debate and disagreement among physicians. Whether a given patient in fact had PAD is a matter of medical opinion and expertise. Because a diagnosis is a judgment made by a medical professional in the exercise of their training, experience, and knowledge, a "properly formed and sincerely held clinical judgment is not untrue *even if a different physician later contends that the judgment is wrong*." *AseraCare*, 938 F.3d at 1297 (emphasis added). As a result, a "reasonable difference of opinion among physicians reviewing medical documentation *ex post* is not sufficient on its own to suggest that those judgments—or

19

any claims based on them—are false under the FCA." *Id.*

The SAC's allegations about Dr. Baumgaertel's three patients illustrate the problem. Relators allege that Dr. Baumgaertel doubted QuantaFlo's reliability and instead embraced a practice of ordering "follow-up testing." SAC ¶ 259. But the many other providers who used QuantaFlo without follow-up testing were evidently exercising a different clinical judgment. These conflicting "beliefs" about whether a patient has PAD and what methods are appropriate to diagnose the condition are classic clinical *opinions* not capable of being shown to be objectively false, and hence not capable of being shown to be fraudulent. Put differently, Relators prevail only if "a different physician later contends" that United providers' clinical opinions were "wrong"—precisely the scenario that *AseraCare* rejected. 938 F.3d at 1297.

The SAC's allegations about Dr. Amy Chappell, a United beneficiary diagnosed with PAD by a nurse practitioner, have the same issue. SAC ¶¶ 284-85. Despite the clinician's diagnosis, Dr. Chappell and her "personal physician" believe she "did not have PAD." *Id.* ¶¶ 286, 288. But even if United submitted Dr. Chappell's PAD diagnosis to CMS—which the complaint does not allege, *see supra* at 14 n.8— Relators will have to ask the factfinder to choose among the opinions of three medical professionals: the nurse practitioner, Dr. Chappell, and Dr. Chappell's doctor. That violates *AseraCare*'s rule that a "difference of opinion" cannot create FCA liability.[10]

---

[10] To be sure, other areas of the law require factfinders to pass judgment on a previous medical decision. But a medical malpractice suit, for example, asks whether a physician's decision-making was appropriate in the circumstances—a different analysis than whether, under *AseraCare*, it is objectively false. A doctor's judgment may well be less sound than another's without being *fraudulent*.

These examples are symptoms of a broader malady: the SAC seeks to demonstrate falsity through a second-order *scientific* disagreement about whether QuantaFlo is a reliable device. Semler markets QuantaFlo as a more sensitive test that detects PAD at earlier (and more treatable) stages than a traditional test, and the SAC admits that United touted QuantaFlo as a "sensitive test that can identify asymptomatic cases of PAD," *id.* ¶ 210.[11] Where QuantaFlo and other tests reached different results, the question is whether QuantaFlo was identifying true PAD cases earlier or instead generating false positives. But just as a clinical judgment is a matter of opinion, so too is an issue actively disputed between clinicians, scientists, and FDA.

As Relators have already acknowledged, the science on QuantaFlo is divided. On the one hand, the complaint admits "FDA cleared QuantaFlo to 'aid clinicians in the diagnosis and monitoring of Peripheral Arterial Disease.'" SAC ¶ 110. And Relators have previously alleged United and Semler conducted "two clinical trial reports supporting the (alleged) accuracy of QuantaFlo." FAC ¶ 247. On the other hand, Relators point to two studies allegedly suggesting QuantaFlo is unreliable: a "clinical evaluation" based on sixteen patients overseen by one of the Relators himself, SAC ¶¶ 86-93, and a non-peer-reviewed study by a Dr. Keith Pereira, *id.* ¶¶ 81-83.

The question at this stage is not to resolve that scientific dispute. Regardless of who is right, Relators' theory of liability will invite the factfinder to resolve this scientific and clinical debate between experts, including about the comparative

---

[11] For Semler's matching description of the device, see www.semlerscientific.com/quantaflo.

21

reliability of QuantaFlo and other tests, through the rubric of the FCA's "falsity" element. That is improper because "difference[s] of opinion [that] fall[] short of establishing objective falsity" cannot be the basis for FCA liability as a matter of law. *Bell v. Cross*, 2021 WL 5544685, at *3 (11th Cir. Nov. 26, 2021).

*AseraCare* acknowledges a medical diagnosis or scientific opinion can be objectively false if the physician "did not, in fact, subjectively believe" the diagnosis, "no reasonable physician could have" held the opinion, or the physician completely failed to review the "patient's medical records." 938 F.3d at 1297. But the complaint does not allege (let alone with particularity) that the providers who submitted some 700,000 alleged PAD diagnoses did not subjectively believe the diagnoses that they made and certified to be true. Nor does the complaint allege that United itself "did not, in fact, subjectively believe" the diagnoses its providers made. *Id.*; *see infra* Section I.C. Although it asserts that "many providers" distrusted the QuantaFlo results, SAC ¶ 185, the complaint gives only two specific examples, *see id.* ¶¶ 173, 257—an omission that is striking given United's nearly ten million beneficiaries, alleged 700,000 PAD diagnoses, *id.* ¶¶ 111, 269, and tens of thousands of providers. Nor can the use of QuantaFlo for its FDA-authorized purpose constitute a view about the reliability of the device that "no reasonable physician" could have reached. And as Relators have previously admitted, United commissioned two separate studies to assess QuantaFlo—and which "support[ed]" its "accuracy," FAC ¶ 247—so United cannot possibly have so blindly "fail[ed] to review" the situation so as to render the diagnoses objectively false. *AseraCare*, 938 F.3d at 1297.

22

### C.    The Complaint Fails to Plausibly Plead Knowledge

Because the FCA only targets fraud, not negligence or mere errors in judgment, "[t]he FCA's scienter element refers to [defendants'] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023). The statute defines "knowingly," 31 U.S.C. § 3729(b)(1), to mean "actual knowledge, deliberate ignorance, or recklessness." *SuperValu,* 598 U.S. at 750. Although "general allegations are sufficient" to plead knowledge, that requires "'factual content that allows the court to draw the reasonable inference' that a defendant knew about the alleged fraud." *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1179-80 (11th Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678).

Here, to plead an FCA violation, Relators must not merely allege that QuantaFlo is unreliable, that it was used to make PAD diagnoses, that those PAD diagnoses were wrong, and that United submitted these PAD diagnoses anyway. They must also allege that United did all those things *knowingly*. The complaint asserts only two circumstantial bases for inferring United's knowledge: alleged skepticism by two clinicians, SAC ¶ 305, and inferences from QuantaFlo's FDA file, *id.* ¶¶ 308-10. Neither comes close to a plausible allegation of scienter.

<u>First</u>, Relators allege that "UHG was directly advised by myriad physicians" that QuantaFlo was unreliable. SAC ¶ 305. But while the complaint asserts that "many" providers were "skeptical of QuantaFlo," *id.* ¶ 172, it provides only two examples: a nurse practitioner named Kristen Bell, *id.* ¶ 173, and Dr. Baumgaertel, *id.*

23

¶ 257. Skepticism by two providers (or a handful) among thousands does not create a reasonable inference about *United's* "actual knowledge" of QuantaFlo's reliability.

Relators—who are outsiders—plead no facts at all regarding internal discussions within United about QuantaFlo's reliability. The SAC does not say how United reacted to those two providers' skepticism, whether it investigated, and, most critically, whether it agreed—and in fact, Relators admitted in their FAC that, following "pushback from providers," United sponsored "two clinical trial reports [which] support[ed]" the device's "accuracy." FAC ¶ 247. While Relators evidently wish to ignore that concession—as evidenced by their choice to remove it from the SAC—United's commissioning of two clinical trial reports demonstrates an *absence* of deliberate ignorance or recklessness. And Dr. Decker, Relators' supposed insider witness—who purportedly had "direct visibility" into United's use of QuantaFlo— does not allege that United believed that the device was unreliable. *See generally* SAC ¶¶ 193-235. On the contrary, the complaint alleges that United internally stated that it was encouraging QuantaFlo usage "to improve [] screening" of PAD. *Id.* ¶ 208.

Second, Relators allege United should have known QuantaFlo "used unreliable PPG technology." SAC ¶ 308. To reach this result, Relators string together a chain of logical leaps: first, that FDA cleared QuantaFlo under the agency's "predicate device" rules; second, that QuantaFlo's predicate device was a device named FloChec; third, that a "cursory review" of FloChec's FDA authorization would have shown that it used PPG technology; fourth, that under the "predicate device" rules, the two devices should be "substantially equivalent"; fifth, that QuantaFlo therefore must use PPG;

24

sixth, that PPG was unreliable; and lastly, that United thus knew QuantaFlo was unreliable. *Id.* ¶¶ 309-10. This attenuated chain cannot plausibly allege scienter. Each link breaks down upon examination. United did not have a legal duty to "examine Semler's submissions" to the FDA before using QuantaFlo for its FDA-cleared indication. Even if it did, a review of the FDA file would have shown that QuantaFlo—the device at issue here—"us[es] volume plethysmography," FDA K143094—a different type of plethysmography from FloChec, which utilizes "[p]hotoplethysmography" or PPG, SAC ¶ 309.

Moreover, even if United should have somehow discerned—notwithstanding the FDA file—that QuantaFlo in fact uses PPG, the complaint lacks any factual allegation plausibly showing that United itself believed that PPG is unreliable for diagnosing PAD. The closest Relators come is to assert that United issued a "reimbursement policy on plethysmography that was '*applicable to UnitedHealthcare Medicare Advantage Plans*,'" SAC ¶ 122 (emphasis added), stating that PPG was "'experimental'" and "d[id] not provide reproducible measurements of blood flow," *id.* ¶¶ 124-25. Relators ignore, however, that because plans administer Medicare-covered benefits, they are required by law to mirror CMS NCDs in administering those benefits, 42 C.F.R. § 422.101—no matter how vehemently they disagree with those decisions.[12] United's issuance of this policy shows only compliance with that legal

---

[12] That is why the United policy duplicates CMS's NCD numbering (20.14), mirrors the text portion of the CMS NCD verbatim, is issued by United's "Medicare Reimbursement Policy Committee," and under "References" cites to CMS coverage decisions and not third-party clinical sources.

obligation. It creates no reasonable inference *whatsoever* about United's own beliefs or knowledge with respect to the reliability of PPG. United pointed this out in its Motion to Dismiss the FAC, *see* ECF 95 at 23 & n.7, and Relators' SAC has no reply.

This allegation is also a red herring. Whether United or any other insurer would choose to pay for an allegedly experimental test is a different question from whether a clinician, in their practice of medicine and relying on their clinical judgment, could look to results from that test in rendering a diagnosis. As the government—the real party in interest—has itself said, an "NCD is neither a practice parameter nor a statement of the accepted standards of medical practice." *Prime Choice*, 2012 WL 9189864, at \*16; *see supra* at 5.

## II.   THE COMPLAINT'S OTHER CLAIMS FAIL (COUNTS III AND IV)

### A.   The Complaint's Reverse False Claims Count Fails

Relators do not plead a plausible "reverse false claim," let alone with particularity. That theory imposes liability when a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" such as a previous reimbursement. 31 U.S.C. § 3729(a)(1)(G). In the MA context, the obligation arises only after a plan identifies an "overpayment" and then fails to return it within 60 days. 42 U.S.C. § 1320a-7k(d)(2); *see also* SAC ¶ 235. Here, Relators allege the overpayments that United retained are the very same payments for "QuantaFlo-based diagnoses of PAD" that support their affirmative false claims theory. *Id.* ¶ 311. The reverse FCA count thus rises or falls with the underlying theory, and it fails for all the reasons set forth above.

While that is alone sufficient to require dismissal of the reverse FCA Count, that identity of claims is independently fatal to Relators' reverse FCA theory for another reason: because the "purpose of a reverse false claim . . . is 'not to provide a redundant basis to state a false statement claim,'" *Graves v. Plaza Med. Ctrs., Corp.*, 276 F. Supp. 3d 1335, 1346 (S.D. Fla. 2017), dismissal is appropriate when a reverse false claims theory is pleaded "merely as another avenue to seek relief already available under §§ 3729(a)(1)(A) or (B)." *U.S. v. Comfort Care Hospice, L.L.C.*, No. 2:20-CV-911, 2026 WL 473999, at *14 (M.D. Ala. Feb. 19, 2026) (granting motion to dismiss); *see also United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 120 (2d Cir. 2021).

The SAC's reverse FCA claim also must satisfy an even higher scienter bar that the complaint fails to pass. Because Section 1320a uses the verb "identified"—which means to "establish," "indicate," or "determine" the identity of something, *see* Identify, *New Oxford American Dictionary* (3d ed. 2010)—actual knowledge of a specific overpayment is required. Relators do not plead any facts suggesting actual knowledge by United of an overpayment. Instead, they allege the Semler settlement put United on notice that it had been overpaid. *See* SAC ¶ 318. But Semler denied liability, and the settlement involved only providers' claims under Medicare Part B for their *use* of QuantaFlo. It never suggested either that PAD diagnoses made with the aid of QuantaFlo were false or that Semler caused MA plans to submit false PAD diagnoses. *See supra* at 6-7. And Semler was not required to cease marketing its device for use in diagnosing PAD and continues to do so today. *See id.*

27

**B.    The Complaint Fails to Plead a Conspiracy Count with Particularity**

Finally, Relators fail to plead with particularity that United "conspire[d] to commit a violation" of the FCA. 31 U.S.C. § 3729(a)(1)(C). Rule 9(b) applies to FCA conspiracy claims, so Relators need to plead with particularity that United entered into an agreement with Semler "to commit a violation"—that is, to break the law. *See Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1319 (11th Cir. 2024).

Here, the complaint is devoid of "'facts as to time, place, and substance of [defendants'] alleged fraud,' [including] 'the details of [defendants'] allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Gose*, 109 F.4th at 1320 (citation omitted). In *Gose*, the complaint pleaded a conspiracy with sufficient particularity because it alleged the precise dates of "emails," "phone calls," and "in-person meetings" during which the conspiracy was formed, even "going so far as to name the executives who orchestrated the agreement" and its terms. *Id.* Relators' complaint pleads none of these facts. At best, they allege United had a contract with Semler, *see* SAC ¶¶ 128-32, and "purchase[d]" Semler's products "for the purpose of diagnosing PAD," *id.* ¶ 322. But the allegation that United purchased a product for its FDA-cleared purpose—which could apply to any contract between any medical device company and any health insurer engaged in an entirely lawful course of business— cannot constitute the particulars of an agreement to violate the FCA. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[L]awful parallel conduct fails to bespeak unlawful agreement."). The conspiracy claim therefore must also be dismissed.

28

## III.   THE QUI TAM PROVISION IS UNCONSTITUTIONAL

The FCA's qui tam provision, 31 U.S.C. § 3730(b)(1), authorizing private relators to enforce the statute, "is unconstitutional." *U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1322 (M.D. Fla. 2024). As a sister court in this District held, a relator's "exercise [of] core executive power" without constitutional appointment "directly defies the Appointments Clause" and "require[s] dismissal" of the qui tam complaint. *Id.* at 1323-24. While that court declined to reach other constitutional claims, the qui tam provision also contravenes the Vesting Clause's mandate that "the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020). And because a "lawsuit is the ultimate remedy for a breach of the law," the qui tam provision also violates the Take Care Clause's choice to "entrust[] the responsibility" of the "enforcement power" solely to the President. *Buckley v. Valeo*, 424 U.S. 1, 138 (1976).

The Eleventh Circuit is currently reviewing *Zafirov*, and the parties there have briefed all three constitutional theories. At oral argument, defendants conceded that the issues are purely legal and that the Court of Appeals could affirm on any of the theories: the Appointments Clause, the Vesting Clause, or the Take Care Clause. *See U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*, No. 24-13581 (11th Cir.). If *Zafirov* is affirmed on any ground, this case "must be dismissed." 751 F. Supp. 3d at 1300. United anticipates that the Eleventh Circuit will either affirm or reverse outright. However, if the Court of Appeals instead reverses and remands for consideration of the Vesting and Take Care Clause theories by the district court in the first instance,

29

United respectfully requests that this Court permit supplemental briefing addressing those substantial issues in light of the Court of Appeals' intervening guidance.

## CONCLUSION

Relators have not identified a single false claim—the central requirement for an FCA complaint—nor a claim that *could* be proven objectively false. For a program with tens of thousands of clinicians and nearly ten million beneficiaries, Relators' reliance on the complaints of two providers and attenuated inferences from FDA documents does not come close to plausibly alleging United's knowledge of fraud. And in any event, their prosecution of this lawsuit violates Article II. Because the SAC—filed after seeing United's first motion to dismiss—cannot be cured by further amendment, United's motion to dismiss should be granted with prejudice.

Dated:   June 26, 2026

Respectfully submitted,

/s/ Daniel Meron
Daniel Meron (*pro hac vice*;
    Lead Counsel)
Jonathan L. Williams (FBN 117574)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1100
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
daniel.meron@lw.com
jonathan.williams@lw.com

Kirstin Scheffler Do (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611-3695
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
kirstin.schefflerdo@lw.com

*Attorneys for Defendants UnitedHealth Group, Inc. et al.*

31

## LOCAL RULE 3.01(g) CERTIFICATE

Pursuant to Local Rule 3.01(g), counsel for United certifies that they have conferred with counsel for Relators, who represented that Relators intend to oppose the motion. The conference occurred via video conference on June 11, 2026.

32